# COURT OF ERRORS AND APPEALS.

Between JAMES EARL and SAMUEL I. HUNT, appellants, and MARY H. DE HART, respondent.

If the surface of the ground is such as to collect water at different seasons of the year, to an extent which requires an outlet to some common reservoir, and if such is always the case in times of heavy rain and melting of snow, and if, as far as the memory of man runs, that flow of water produced a natural channel through the lands of different persons, where such accumulated surplus water has always been accustomed to run, a court of equity will protect such channel from obstruction to the injury of any one through whose lands it runs.

The question, whether an outlet for water is an *ancient watercourse*, does not depend upon the quantity of water it discharges. If the face of the country is such as necessarily collects in one body so large a quantity of water, after heavy rains or melting of snows, as to require an outlet to some common reservoir, and if such water is regularly discharged through a well defined channel, which the force of the water has made for itself, and which is the accustomed channel through which it flows, and has flowed from time immemorial, such channel is a natural watercourse.

Where A. has drained his land by a ditch through the land of B., using it as an adverse right for more than twenty years, he acquires an easement in the land of B. which is entitled to protection.

The bill in this case was filed by Mary H. De Hart against James Earl and Samuel I. Hunt, to restrain them from obstructing a watercourse. An *ex parte* injunction was granted, which, upon final hearing, was made perpetual. From that decree this appeal was taken. The Chancellor furnished the court with the following opinion, as containing his reasons for the decree.

THE CHANCELLOR. The complainant is the owner and occupier of a tract of land, of about seven acres, in the

City of Elizabeth, in the county of Essex, with its south-
ern boundary lying on Jersey street, in said city.    The
defendants own an adjacent lot, bounding south on Jer-
sey street ninety-eight and a quarter feet, and about
twice that distance on Meadow street.

The complainant, in her bill, alleges, " that the easterly
and northerly sides, or parts, of her said lot of land and
premises are somewhat elevated, and the surface thereof
inclines gradually towards the said lot of land of the de-
fendants and Meadow street; and that an ancient stream,
or watercourse, passes over and across the complainant's
lot of land, and through and across the gardens of her
two dwelling houses, and near the said dwelling houses,
over and across the said lot of the defendants, in a west-
erly direction to said Meadow street, and in which the
water hath for time immemorial been wont and used to
run and flow, and of right had run and flowed, over,
across, and from and off the said tract or parcel of land
and premises and said gardens and dwelling houses of
the complainant, over and across the said lot of land of
the defendants to Meadow street, and from thence into a
certain brook, or creek, crossing Jersey street, and still of
right ought so to run and flow."    The bill complains that
the defendants have dammed off the watercourse at the
partition line between the complainants' and defendant's
lots, so as to flow back upon her premises, and thereby
greatly to injure the same.

An injunction is prayed against the said defendants, to
enjoin and restrain them from permitting the channel of
the said watercourse to remain filled up and obstructed
in the manner the same has been filled up and obstructed
by the defendants, as is stated in the said bill, and from
further filling up and obstructing the same.    On filing
the bill, an injunction issued.    The defendants answered
the bill, and the cause has been brought to a final hearing
upon the pleadings and proofs taken in the case.

The defendants, by their answer, deny that there is an

2 a*

ancient stream, or watercourse, passing over and across the complainant's land through and across the defendants' land. They say that there is no stream of water there at all, but that the natural face of the ground is such, that in heavy rains, or melting of large bodies of snow, which produce a flood of water on the surface, the water naturally flows from the complainant's lot across the defendants' lot, following a ditch in their lot occasioned by the water received from the complainant's lot following a slight natural depression in the surface of the ground, until the same is discharged at Meadow street. The answer admits, that for a long time past there has been a gutter along Meadow street, which carries the water, thus discharged through the defendants' land, across Jersey street, which thence flows into the Elizabethtown creek, or river.

The answer certainly goes very far to admit the case made by the complainant's bill. It admits that there is a considerable quantity of water requiring an outlet from the complainant's land at certain seasons of the year, and that, from the natural formation of the surface of the ground, the water naturally flows from the complainant's land across the lot of the defendants. The answer does not deny the material allegation of the bill, that the water has flowed in this same course from time immemorial. The defendants put themselves upon the ground, that while this is the natural outlet for the water, the complainant, in her bill, has wrongfully dignified it with the appellation of a stream, or natural watercourse. The answer calls it a ditch, and an affidavit to the answer says that the said channel is not a watercourse, but merely an upland drain. And yet the answer does not say that it is an artificial ditch, but expressly affirms that it was made by the water received from the complainant's land. Now, if there is a quantity of water collecting at different seasons of the year on the complainant's land, to such an extent as requires an outlet to some common

reservoir, and if such is always the case in times of heavy rain and melting of snow, and if, as far back as the memory of man runs, that flow of water produced a natural channel through the defendants' land, where such accumulated surplus water has always been accustomed to run, the right of the complainant to have the water discharged in the same channel for the relief of her land is so clear that a court of equity would not refuse to protect her right from the mere consideration that the complainant, in stating her case in her bill, has made use of technical terms not the most appropriate to meet the exigencies of her case.

But I think the facts admitted in the answer show that this is an ancient stream, or watercourse, and that it is a natural watercourse, in the etymological use of the term. A watercourse is defined to be "a channel or canal for the conveyance of water, particularly in draining lands." It may be natural, as when it is made by the natural flow of the water, caused by the general superficies of the surrounding land from which the water is collected into one channel, or it may be artificial, as in case of a ditch, or other artificial means, used to divert the water from its natural channel, or to carry it from low lands, from which it will not flow, in consequence of the natural formation of the surface of the surrounding land. It is an ancient watercourse, if the channel through which it naturally runs has existed from time immemorial. Whether it is entitled to be called an ancient watercourse, and, as such, legal rights can be acquired and lost in it, does not depend upon the quantity of water it discharges. Many ancient streams of water, which, if dammed off, would inundate a large region of country, are dry for a great portion of the year. If the face of the country is such as necessarily collects in one body so large a quantity of water, after heavy rains and the melting of large bodies of snow, as to require an outlet to some common reservoir, and if such water is regularly discharged through a

well defined channel, which the force of the water has made for itself, and which is the accustomed channel through which it flows, and has flowed from time immemorial, such channel is an ancient natural watercourse. .

There is no discrepancy as to the evidence in the cause. It is proved beyond controversy, by the witnesses on both sides, that the surface of the complainant's land is such as to collect, in wet times, and always after heavy rains, a large body of water on her land; that this water collects into a narrow, but well defined channel on the same land, and passes off through a like channel over the land of the defendants, and finally empties itself into the Elizabethtown creek; that the channel, until it reaches Meadow street, was originally made, and continues, by the natural flow and force of the water, and as far back as the memory of any of the witnesses runs, that same channel has always discharged the water.

David Woodruff, one of the defendants' witnesses, testifies, that he knew this drain, as he designates it, twenty-eight years ago; that it run then in the same place as it does now. He says, that there has been, ever since he can remember, " an evident mouth of a ditch" opening into Meadow street from the land of the defendants, and that there has always been a bridge, or timbers laid across that mouth in Meadow street, to cross over, except at short intervals.

James Woodruff, another of defendants' witnesses, is sixty years of age, and has lived in Meadow street, but a short distance from the premises in question, for fifty years, and his land joins the complainant's land on the north side. He says the drain across the defendants' lot has always been there since his recollection, and that, twenty-five years ago, a Mr. Phinney, who then lived there, placed a box of twelve inches square to carry off the water under the sidewalk in Meadow street.

Dr. Chetwood went to live on the same premises now occupied by the complainant in the year 1828, and re-

sided there till 1837 or 1838. When he went there, he found this same channel for the water running through the land he occupied, and thence through the land of the defendants to Meadow street. He says the water flowed over the defendants' land through an obvious and well defined channel, and that it was essential to the comfortable and convenient occupation of that property that it should be drained by this channel, or by some other one as effective as this. He says, it was once or twice dammed up by Mr. Phinney, between 1830 and 1836, but the witness had it immediately opened.

Mr. Jenkins occupied the premises of the defendants from 1847 to 1851. He says the channel across this lot is the natural and only outlet for the water falling on the ground in times of rain, or thawing of the snow, or issuing from the springs in the soil. He says, that in excessive rains the water will still force itself, notwithstanding the filling up of the channel, into Meadow street.

The testimony of all the witnesses on all these material points—the necessity of an outlet for the water—that this is its natural flow—that it is a channel well defined—and that it is an ancient channel—is uniform.

This water having run in the same course for more than twenty years, and the complainant, and those under whom she holds, having enjoyed it as a right during that period in its present channel, no one has a right to dam up the channel, or to divert the course of the water, to the injury of the complainant's land. It makes no difference whether it is a natural watercourse or an artificial ditch. If it is a mere ditch, and the complainant's land has enjoyed the use of it for more than twenty years, and as an adverse right, then it is an easement which the owner of the complainant's land has in that of the defendants; it is a privilege without profit, and is as much the subject of protection as a natural watercourse.

The defence set up by the defendants is—

First, the one already alluded to, that this is not an ancient watercourse.

Second, it is insisted that, in consequence of the small quantity of water running, the complainant can, at a small expense, cut a drain or outlet for the water before it reaches the defendants' premises, and discharge it into Jersey street. This defence admits the injury. It requires of the complainant to cut up her own land to make a new channel for the water, and puts her to expense to effect the object. There is some conflict in the evidence, as to whether such a drain can be made as would be effectual to discharge the water in Jersey street, and as to the disposition of the water when it should reach that street. But the defendants have no right to demand of the complainant to make that experiment, or incur its expense. She has a right to have the water discharged on the defendants' land: when it reaches there, they may dispose of it at their pleasure, so that it is not to the injury of the complainant.

Third, it is insisted that the law, as to running water, does not apply to building lots in a city or large towns. I cannot see why it does not. Here is a body of water which must be discharged, either over the building lot of the complainant or over the building lot of the defendants. It is true it is injurious to the lot of the defendants to have it discharged over it, but then it is the right which the neighboring lot enjoys to have it so discharged. There is a right and an obligation, as between the two lots, which have been acquired and imposed by prescription. The complainant's is the dominant, to which the right belongs, and the defendants' the servient, upon which the obligation rests. To have this water discharged upon the complainant's land is as great an injury to her building lot as it is to the defendants' lot to have it discharged there. There can be no such difference in the application of the law, as to building lots, as will impose a burthen upon one which properly and of right belongs to another.

I think it is very clear that the complainant is entitled to have the injunction made perpetual.

There is another question, and that is as to the extent of the injunction. When the bill was filed the channel for the discharge of the water was stopped up, and it would appear, from the evidence, that it remains so still. The prayer of the bill is, that the defendants may be decreed to abate and remove the obstruction, and that they may be enjoined from permitting the channel of the said watercourse to remain filled up and obstructed, in the manner the same has been filled up and obstructed, as complained of in the bill.

The complainant is entitled to have the obstruction removed. There is no reason why the court should not exercise a power to abate as well as prevent the erection of nuisances in clear cases. It is unnecessarily stripping the court of half its power to deny it this jurisdiction. If the court can decree it a nuisance, it should possess the power to give efficacy to such a decree, otherwise it pronounces a judgment it has not power to execute. In the case of *The East India Company* v. *Vincent*, 2 *Atk.* 83, Lord Chancellor Hardwick declared a wall erected by the defendant to be a nuisance, and decreed the same to be pulled down. There are a number of other English authorities.—See note to case in 2 *Green's Ch. Rep.* 136.

In *Van Bergen* v. *Van Bergen*, 2 *Johns. Ch. Rep.* 272, the Chancellor says—I have no doubt of the jurisdiction of the court in cases of private nuisance. It can order them to be abated, as well as restrain them from being erected. And in *Hammond and others* v. *Fuller and others*, 1 *Paige's Ch. Rep.* 197, the Chancellor affirms the right of the court to decree a dam shall be lowered which raises a stream of water above its natural channel, so as materially to injure mills above.

Let a decree be entered in accordance with these rules.

The appeal was argued by

*F. B. Chetwood*, for appellants.

*Asa Whitehead*, for respondents.

Earl *v.* De Hart.

Decree affirmed by the following vote:

*For affirmance*—CHIEF JUSTICE, Judges OGDEN, HAINES, POTTS, VREDENBURGH, RYERSON, ARROWSMITH, VALENTINE, CORNELISON, HUYLER, RISLEY, WILLS.

*For reversal*—None.