[L. A. No. 803. In Bank.—April 12, 1902.]

## VENTURA LAND AND POWER COMPANY, Respondent, v. ELISE MEINERS et al., Appellants.

RIPARIAN RIGHTS—BOUNDARIES OF RIVER—HIGH AND LOW BANKS.—In determining what lands are riparian to the waters of a river which has two sets of banks,—one consisting of low banks, in which the stream is confined at low water, and the other consisting of high, or fast, banks, which confine the stream in its entire width at its highest flow,—such high banks must be taken as the true boundaries of the river, and the highest flow of water in the river in its entire width between the high banks is subject to the right of user by the riparian owner.

APPEAL from a judgment of the Superior Court of Ventura County and from an order denying a new trial. B. T. Williams, Judge.

The facts are stated in the opinion of the court.

J. L. Murphy and H. L. Poplin, for Appellants.

John S. Chapman, Orestes Orr, and Barnes & Selby, for Respondent.

McFARLAND, J.—When this case was in Department the opinion hereto attached was prepared by Commissioner Smith. Upon full consideration of the case, we are satisfied with that opinion and the conclusion then reached; and for the reasons given therein the judgment and order must be reversed. It may be observed, further, that this case differs materially from the ordinary case where a stream runs through a valley between rather low banks which usually, but not always, contain its waters, and where the land adjacent to the banks differs in character from the bed of the stream, and is composed of arable and fertile land. In such a case the land which is sometimes overflowed by the waters from the stream does not have the characteristics of a river-bed, and presents a condition very dissimilar to that of the land between what are called the ''high banks'' in the case at bar. The latter is similar in

its general character to the part of the river-bed lying within what are called the "low banks."

The judgment and order denying a new trial are reversed.

Temple, J., Harrison, J., and Garoutte, J., concurred.

SMITH, C.—This suit was brought to enjoin John Meiners (the original defendant, now represented by his executrix) and defendants sued by fictitious names from diverting water from the San Buena Ventura River, and to quiet the title of the plaintiff to the waters of the river. The diversion complained of commenced September 4, 1891, and has since been continuous. The complaint was filed August 29, 1896. José Ramon Lopez answered as one of the fictitious defendants.

The action of the plaintiff is based upon its alleged right as riparian owner to the use of the waters of the river on its lands for irrigation and domestic uses—the amount alleged to be necessary for those purposes being six hundred inches under a four-inch pressure. The answer of the defendants sets up their respective ownership of the lands mentioned in the answer, and presently to be described,—which they allege are riparian to the river,—and the amounts of water required by these lands respectively for irrigation and domestic uses; and also an appropriation of the water of the river to the amount of one thousand inches by Meiners, of date September 4, 1891, and a joint ownership of one hundred and twenty inches by virtue of a prior appropriation by the father of the defendant Lopez. To understand the precise nature of the issues thus presented, and the findings and evidence with regard to them, an explanation of the topography of the river and the adjacent lands will be necessary.

The general course of the river, or, rather, of the part of it represented on the map in the record, is from north to south; and with reference to it, the situation of the lands of the parties, and of other lands referred to in the evidence, is as follows:—

To the north is the southwest quarter of section 28, township 5 north, range 23 west, patented June 25, 1885, to one P. W. Soper. Through this tract (which is only incidentally involved) the course of the river is east and southeast, passing out of the land at its southeast corner.

From this point the river passes through the northeast quarter of section 33, same township, entered by one Thelan as a homestead June 13, 1889, and patented May 16, 1892. This tract, when the suit was commenced, was owned by John Meiners, except a piece west of the river conveyed by him to one Kennedy.

Next south of this, the course of the river is through the fractional southeast quarter of the same section, patented June 15, 1892, to Francisco Lopez; of which a rectangular strip, along its north side, containing twenty-seven acres, was conveyed by him to Meiners, and is now the property of his estate.

Near the middle of this quarter section, at a point called the Rancheria de Matilija, on the east side of the river, is the north corner (being station No. 2) of the Rancho Santa Ana, granted April 14, 1837, and patented December 22, 1870, from which station one course of the patent runs south fifty-five degrees twenty-six minutes west, crossing the river, and the other south six degrees west to the east of the river,—as delineated on the map. Of this part of the ranch, the land lying east of the thread of the river is the property of the plaintiff,—the land lying to the west of it being the property of Mrs. Rice, plaintiff in another case against Meiners, now before this court on appeal,—being Los Angeles No. 804. The former tract contains about six hundred and fifty acres, the latter about seven hundred.

South of the eastern part of the Francisco Lopez tract, and east of the Rancho Santa Ana, lies the fractional northeast quarter, or lots 1 and 2, of section 4, township 4 north, range 23 west, containing 68.48 acres of land, entered as a homestead April 20, 1887, by the defendant José Ramon Lopez, to whom the receiver's receipt issued July 18, 1892. Of this, a tract of about forty-five acres was conveyed by Lopez to Meiners,— leaving the former about twenty-three acres situated in the northeast corner of the tract. Meiners was, and his estate now is, the owner also of the northwest quarter of section 3, same township, adjoining this tract on the east, with the exception of a lot of 5.85 acres in the southeast corner.

South of these tracts lies a tract of eight hundred and one acres of land acquired by Meiners April 17, 1876, and forming part of the Rancho Ojai, granted April 6, 1837, and patented December 22, 1870.

The ownership of the several tracts of land, as above described, is found by the court.  The court also finds that the plaintiff's lands are riparian to the stream, and about three hundred acres thereof susceptible of cultivation; that the lands of Meiners in the northeast quarter and in the southeast quarter of section 33, township 5 north, etc.,—the former acquired from Thelan, the latter from Francisco Lopez,—are riparian, and entitled to the use of ten inches of water, measured under a four-inch pressure, and that his other lands—namely, the forty-five acres in the northeast quarter of section 4, and the northwest quarter of section 3, township 4, etc., and the tract of eight hundred and one acres in the Ojai ranch—and the land of Lopez are not riparian; that Meiners had diverted the water of the river as alleged to the amount of one hundred and twenty inches, etc.; that he and the defendant Lopez were the owners of the water claimed by them as appropriated by Lopez to the amount of forty-five inches, etc.; that by reason of these diversions the flow of water to plaintiff's land had been diminished, etc.; and, as conclusions of law, that the defendants were diverting an amount of water largely in excess of what they were entitled to, and plaintiff was entitled to judgment perpetually restraining them from diverting the water of the river in excess of the amount to which they were entitled as above found; and judgment was entered accordingly.

The main question involved in the case is as to the finding of the court, that the land of the defendant Meiners in the Ojai ranch, and the Ramon Lopez homestead are not riparian. But this question with regard to the latter tract is immaterial, as it is found that the defendants are the owners of forty-five inches of water appropriated by the father of Lopez, while the tract was still public land, which is more than it would be entitled to as riparian property.  The question will be considered therefore as though referring to the Ojai ranch land only.

The Ojai ranch is the older grant, but the Santa Ana ranch was the first surveyed, and its east boundary constitutes the west boundary of the former.  The location of this line (which is the first course of the Santa Ana patent) is not disputed. It runs northerly from the beginning point on the river—a distance of about eight miles—to station 2, at the Rancheria de Matilija, referred to above, which is apparently represented

on the plat accompanying the patent as being on or near the river-bank. Between these points the river is delineated as lying some distance to the west of the line. There is also in the record—put in evidence by the plaintiff—a larger map, made for the occasion, which shows in detail the topography of the stream and its environs. On this map *"the water channel"* of the river (as it is called by the surveyor and as we will call it) is represented by the blue strip; and it is claimed by the plaintiff that the elevations along the outer lines of the water channel, as thus delineated, are *the banks* of the stream, and the space between these *the river bed.* But beyond these lines, at varying distances on either side of the stream, there are represented on the map continuous elevations, bounding the valley or river bottom. The latter are spoken of by several witnesses, and by the surveyor, among others, as *"the high banks"* of the river; and, to distinguish these from what may be called *"the low banks,"*—claimed by the plaintiffs to be the banks of the river,—we will make use of this expression. The precise question involved is whether the high or the low banks are to be taken as the true banks of the river.

On the west side of the river the high and low banks very nearly coincide; and this is the case on the east side along the upper stretch of the river. But at a point somewhat above Matilija, the banks commence to diverge,—the distance between them at that point being about one hundred and fifty feet. Further down,—about a mile and a half,—at a point a little below the southwest corner of the Meiners tract in the Ojai ranch, the banks again come together; and below this point—as far as shown by the map, or by the plat in the Ojai patent—they coincide, or nearly coincide. Between the two points described,—i. e. Matilija and the southwest corner of the Meiners tract,—the two banks diverge more widely,—the extreme divergence being at the present time something over two thousand feet. But five or six years ago the water-channel was farther east, and the extreme divergence only six or eight hundred or a thousand feet.

The ground between the high banks is a low, level flat, in some places a little above and in others a little below the level of the bed of the water-channel. The nature of the soil may be described, in general terms, as similar to that usually con-

stituting the bed of a stream or watercourse, or, more specifically, as variously expressed by the witness, as "gravel, sand, and bowlders," "slickens," "wash land made by the river," "sand and wash," "river bed," "bowlders and stuff that wash down the river," etc.   Some parts of it are susceptible of cultivation, and some have in fact been cultivated.   It is intersected by numerous lateral channels, through which the river flows in times of high water, shifting its channel at times from one to the other.   Among these is a channel four to six feet deep and forty to sixty feet wide, which enters and passes through the Ojai ranch, passing out of it at the southwest corner of the Meiners tract.    This is obstructed at its head by a bank of bowlders, over which in times of flood the water flows, —as seems to have happened in the years 1884, 1885, 1886, 1889, 1892, 1893, and 1895.   On some of these occasions, the whole of the space between the high banks has been covered with water.   The low banks of the river have an elevation of six or seven feet above the bed of the water-channel, and are composed of the same material as the adjacent land,—i. e. bowlders, gravel, etc.   Their location varies with the water-channel, which shifts frequently from place to place.   The natural tendency of such changes is to the eastern part of the bottom, which is the lower; but owing to obstructions thrown up by the water, the actual change opposite the defendants' land has been to the west.   The high banks of the river are about twenty-five feet high, and are of a permanent nature.

In the above statement the description of the river and the land between the high banks is taken mainly from the map introduced by plaintiff and the testimony of the surveyor, who was a witness for the plaintiff, and whose testimony is confirmed by the testimony of the witness Rice, the husband of plaintiff in the case of *Rice* v. *Meiners, post,* p. 292.   Both of these witnesses, it may be observed, claim the bed of the river to be the space between the low banks, but both also speak of the wider tract as the *river-bed*—as, e. g., the former where he says, "My map shows the width of the river-bed there, from high bank to high bank"; and the latter where he says, "I saw a shaft sunk in the river-bed bottom land of Mr. Meiners on the Ojai ranch," etc.   These expressions—though otherwise of trivial importance—are significant as showing

CXXXVI. Cal.—19

the impression naturally made on observers by the character of the ground.

Some light might have been thrown on the question involved by the field-notes of the surveys in the two grants—without which the plats are of but little significance—and by the decrees of confirmation, both of which are commonly recited in the patents of Mexican grants. But in the absence of these the question must be determined by the general principles of the law applying to the subject.

According to the most approved definitions, the banks of rivers or other watercourses are "those boundaries . . . which contain their waters at their highest flow"; or, as otherwise expressed by the same judge, they are "the fast land which confines the water of a river in its channel or bed, in its whole width"—i. e. as determined by its highest flow. (*Howard* v. *Ingersoll*, 13 How. 415, 417.) This accords with the definition given in *Stone* v. *Augusta*, 46 Me. 137, to wit: "By this term is understood what contains the river in its natural channel when there is the greatest flow of water"; and also the definition in the digest, cited Angell on Watercourses (sec. 24, note 3), viz.: "That is considered the bank which contains the river when *fullest*." This definition seems to have geen generally accepted. (Kinney on Irrigation, sec. 39, note 43; Gould on Waters, secs. 41, 45, and notes; Long on Irrigation, sec. 32; Angell on Watercourses, secs. 4, 24, and notes, cited *supra; Palmer* v. *Waddell*, 22 Kan. 355, and *Earl* v. *De Hart*, 12 N. J. Eq. 280,[1] there cited; *Sparks Mfg. Co.* v. *Town of Newton*, 57 N. J. Eq. 383, 384.) In the case last cited it was said: "I find it quite impossible to distinguish, in the matter of exclusive title and riparian right of user, between what counsel for the defendant classes as 'freshet of flood water' and other water. They are all parts of the running stream, and as such become subject to the right of user by the riparian owner"; and further to same effect. The principle thus established is peculiarly appropriate to this state, where the changes in rainfall from year to year may be said to be periodical. The rule is, however, to be understood as qualified by the principle that "in general, in order to constitute a watercourse, the channel and banks formed by the flowing of the water must present to the eye . . . the unmistakable evi-

[1] 72 Am. Dec. 395.

dences of the frequent action of running water." (Gould on Waters, sec. 264.)

The definition cited from *Howard* v. *Ingersoll,* 13 How. 415, 417, is taken from the leading opinion by Wayne, J.; but Judge Curtis gives a somewhat different definition, in which the character of the *bed* of the river is taken as the distinctive element of the definition; and the bed is defined as "that soil so usually covered by water as to be distinguishable from the banks by the character of the soil or vegetation, or both, produced by the common presence and action of flowing water." "In all cases," he continues, "the bed of a river is a natural object, and is to be sought for, not merely by the application of any abstract rules, but as other natural objects are sought for and found, by the distinctive appearances they present, the banks being fast land, on which vegetation appropriate to such land in the particular locality grows," etc. But the case comes equally within this definition. Both definitions agree in holding that the bed of the river is bounded by the permanent or *fast* banks by which its waters are confined; and in this case there is but one set of banks that can be thus characterized. Where there is a question between two such banks,—as in the view of Judge Curtis was the case in the decision cited,—the considerations adduced by him should have a great if not controlling influence; though in fact, even on his own definition, it is not clear that the view of the majority was wrong. Judge Curtis concurred in the judgment. Judges Nelson and Grier dissented, but apparently on the construction of the grant involved, rather than on the question of definition.

I advise that the judgment and order appealed from be reversed.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing.