[Civ. No. 6457. Third Appellate District.—July 1, 1940.]

MAMMOTH GOLD DREDGING COMPANY (a Corporation), Respondent, v. E. F. FORBES et al., Appellants.

Edward J. Bloom for Appellants.

Rich & Rich, W. P. Rich, Rich, Weis & Carlin and Richard H. Fuidge for Respondent.

THOMPSON, J.—The defendants have appealed from a judgment which was rendered against them in a suit quieting title to a tract of land consisting of eight acres of the Yuba River bed at a point about fifteen miles northeast of Marysville. The land was purchased for placer mining purposes. The deed was executed in October, 1914, and described the premises as "lying and being between the *present high water mark on the right bank of the Yuba River* and the center of said river commencing with the south boundary line of Sec-

tion Number Twenty-one (21) in township number sixteen (16) North, of Range number six (6) East M. D. B. and M. and running to the southerly line of the Havey claim (also known as the Mt. Clair Placer Claim) situate in said Section number twenty-one (21) the length of the land hereby conveyed being 1320 feet in length, more or less''. There was then a clear high water mark visible along the base of the permanent red earth bank of the river on the east.

The questions to be determined on this appeal are: 1. Did the grantor intend by the language of the deed to bound the demised land on the east by the permanent, perpendicular, high, red earth bank which extends along the margin of the clearly-defined gravel bed of the river, or by the temporary five-foot gravel bank adjacent to the diminished summer flow of the stream? 2. By the use of the term "*present* high water mark on the right bank" did he intend to convey land to the clearly-defined water mark which was then visible on that bank, or only to a theoretical *average* high water mark of the river?

The appellants contend that the findings and judgment are not supported by the evidence.

The Yuba River rises in the Sierra Nevadas and flows southwesterly into the Feather River in the vicinity of Marysville. It is a typical California mountain stream with a variable volume of water, depending upon the seasons and the amount of rainfall and melted snow which are supplied from its watershed. The river is at its highest level in the winter and spring months when the rain and the melted snow are running off. For many decades this river has annually carried great quantities of water as indicated by its permanent high banks and by the depth and broad expanse of the river bed. In the vicinity of the property in question the river bed is from 400 to 1,000 feet in width and is composed of a deep layer of sand, gravel and boulders containing Piedmont Deposit from which a considerable quantity of gold has been extracted by placer mining enterprises since the pioneer days of California. That gravel bed is 30 or 40 feet in depth. The stream frequently changes its course along the river bed in the dry months of the summer when the water is low. During that period of time the summer flow of water often forms temporary gravel banks along the

course of the stream eight or ten feet in height. Those temporary banks are usually washed away by the force of the greater volume of water during the wet seasons. The river, at its highest level, fills the entire channel from the red earth bank on one side of the stream to the bank on the other side. These permanent banks rise almost perpendicularly from the outer edges of the gravel bed to a height of 30 feet or more.

As the river reaches a point just west of the line between Nevada and Yuba Counties, where the town of Smartville is located, it makes an abrupt turn to the north for a distance of about a mile, describing a U-shaped curve called the Timbuctoo Bend, and then returns to its original southwesterly course, flowing into the Feather River at Marysville. The land which is involved in this suit is located about fifteen miles northeast of Marysville and consists of eight acres of the river bed on the easterly side thereof just beyond the turn of its course to the north, at Smartville. The land is adjacent to the southerly line of section 21, and extends northerly therefrom a distance of 1320 feet, thence westerly to the thread of the stream and back to the point of beginning. It is bounded along the easterly side by the visible high water mark on the base of the permanent perpendicular red earth bank of the river. The plaintiff owns all of the land on the westerly side of the river, opposite the land in question and there is therefore no dispute regarding that western line of the property. The entire controversy is over what constituted the "present high water mark on the right bank of the Yuba River" when the deed was executed in October, 1914.

The cause was tried by the court sitting without a jury. Findings were adopted favorable to the plaintiff in every essential respect. A decree was accordingly rendered quieting title in the plaintiff to the strip of land which is described in the findings and judgment by metes and bounds, extending to the visible high water mark on the base of the permanent red earth bank on the eastern side of the river. From that judgment the defendants have appealed.

The findings and judgment are adequately supported by the evidence.

Colonel E. A. Forbes, now deceased, the grantor of the placer mining property in question, was a lawyer of some promi-

nence, a member of the legislature and the owner of extensive grazing and farming lands in that locality. The gravel flat was purchased for placer mining dredging purposes. Other similar enterprises of that nature had been previously conducted in the bed of the Yuba River in that vicinity. We must presume that Colonel Forbes as a lawyer understood the legal meaning of the phrase, ''present high water mark *on the right bank*'' which he used in the deed. There can be no doubt the parties to that deed intended that conveyance to extend along the easterly side to the visible high water mark on the base of the permanent bank of the Yuba River, and not merely to the temporary five-foot gravel bank near the middle of the river bed which confined the greatly-diminished summer flow of water. The very purpose for which the land was purchased is proof of that fact. The flat expanse of that river bed was to be dredged for gold. At the location in question the summer stream followed closely the permanent river bank on the west side. The plaintiff owned the land on the western side of that stream. Most of the bare gravel bed which was then desirable for placer mining was located on the easterly side of the summer stream, which was then quite narrow. If the easterly line of the purchased property was to extend only to the high water mark on the temporary gravel bank of the summer stream, then the plaintiff secured only a very narrow and comparatively useless strip of land for mining purposes. Moreover, the reservations in the deed refute that unreasonable theory. The grantor reserved the right to dig and maintain a canal ''along the . . . right bank of the river on said (demised) land'', as a means of disposing of excess water used in operating an upper placer claim. At that location the summer stream flowed close to the westerly bank of the river. Almost the entire uncovered portion of the gravel bed at that point, which was over 400 feet in width, lay between the channel of the summer stream and the permanent bank of the river on the east. If no part of that gravel bed was intended to be conveyed by that deed, the grantor had no reason to reserve the easement for the ditch because he would then have retained all of that broad expanse of gravel bed which was adequate and far more suitable for the proposed canal than the narrow strip of loose gravel along the margin of the five-foot temporary bank

of the diminished summer stream. The maintenance of a water ditch along the edge of the summer stream would have then been unnecessary and useless. It would seem to be impossible and certainly impracticable to maintain a water ditch in the loose gravel along the margin of the summer stream. The reservation in the deed refutes the theory that the demised land was to be bounded on the east by the temporary bank of the summer flow of the river.

The very purpose for which the land in the river bed was purchased, the reference in the deed to the visible *"present* high water mark on the right bank'' of the river, the definition of the term ''river bank'' and the reservation of the easement to dig a ditch ''along the right bank of the river on said land'' furnish satisfactory proof that the grantor intended to convey river bed land bounded on the east by the visible high water mark then existing on the base of the permanent red earth river bank, and not merely to the temporary five-foot gravel bank of the summer stream.

Two civil engineers and four other witnesses testified that the high water mark of the river was plainly visible by the washed surface and the absence of vegetation along the foot of that eastern red earth bank of the river. There is substantial evidence that the entire river bed is ordinarily covered with water from one permanent bank to the other in the rainy seasons of each year. Several witnesses testified to having frequently seen the entire river bed covered with water from bank to bank. At least one witness said he saw the river in that condition in 1914, when the deed was executed. He observed the water flowing from bank to bank over the entire river bed. Photostatic copies of government statistics of water measurements of the Yuba River, covering a period of several years, offered in evidence by the appellants, show that the water was higher in 1914 than usual. As compared with a maximum discharge of twelve or fifteen thousand second feet of water flowing in that river the preceding year, it contained 45,700 second feet of water in December, 1913. The evidence shows, and this court may take judicial knowledge of the fact that the greatest quantity of water occurs in these California mountain streams, which are fed by winter rains and the melting snows, in the winter and spring months. It follows that the water in Yuba River must

have been quite high in the year 1914 when the deed was executed. The evidence of witnesses who testified that they saw the water flowing over the entire gravel bed from bank to bank in 1914 is therefore satisfactorily corroborated. It will be observed the disputed eastern boundary of the land in question is not described as the *ordinary* high water mark on the right bank of the river, but it is more particularly referred to as the *"present* high water mark"*, which was then visible *on the right bank*. We are of the opinion that specific reference may be reasonably construed to designate the high water mark reached by the river during the season immediately preceding the execution of the deed. It is said in 4 Thompson on Real Property, page 342, section 3231:

"The effect of the deed depends upon its terms and the presumptions arising therefrom, unless the terms used are uncertain or ambiguous, so that parol evidence is admissible to explain them."

The intention of the parties is the real object sought to be determined in construing the language of a deed. Certainly the rule contended for by the appellants is not controlling under the circumstances of this case. They assert that the high water mark must be ascertained by taking an average of the high marks reached by the river over a period of ten or more years prior to the making of the deed. All of the circumstances of this case seem to refute that theory. It is contrary to the apparent intention of the parties to the deed. It is true, as expressed in 9 Corpus Juris, page 192, section 75, that ordinarily, when the intention of the parties does not otherwise appear, that:

"In streams, lakes, or ponds in which the tide does not ebb or flow, low water mark is the point to which the water recedes at its lowest ordinary stage, and not that of an unusually dry season. High water mark is the point to which the water rises at its average highest stage."

This case, however, does not present the question of ascertaining the location of *an average high water mark*. It clearly presents the question as to whether the language of the deed, construed in the light of surrounding circumstances, indicates that the grantor intended to convey land bounded on the east by a visible high water mark then existing along the base of the permanent red earth bank of the river. There

is ample evidence that visible high water mark then existed on that permanent river bank.

A specific reference in a deed to the ''present high water mark on the right bank of the Yuba River'' may be reasonably construed to apply to a definite visible water mark which clearly appeared at the time of the execution of the deed on the face of the bank, rather than to a mere theoretical or invisible line estimated as the point to which the water rises *at its average highest stage*. In this case the deed clearly refers to the ''present'' mark caused by high water which appears on the right bank of the river. There can be no doubt the grantor referred to the permanent right bank of the river, and not to the temporary gravel bank on the margin of the summer stream. The evidence clearly proves that a high water mark actually existed along the foot of that permanent bank in 1914 when the deed was executed. All the circumstances surrounding the case corroborate that fact.

In the present case there is evidence that the water of the river had washed a smooth, visible line along the base of the river bank. It was devoid of vegetation along that line. These are competent circumstances to consider in locating a designated boundary line. (*Carpenter* v. *Hennepin County*, 56 Minn. 513 [58 N. W. 295]; *St. Louis etc. R. Co.* v. *Ramsey*, 53 Ark. 314 [13 S. W. 931, 22 Am. St. Rep. 195, 8 L. R. A. 559]; *Ephraim Creek Coal etc. Co.* v. *Bragg*, 75 W. Va. 70 [83 S. E. 190]; 9 C. J. 193, note 43 [b] and [c].)

Moreover, there is substantial evidence that the visible washed line along the base of the east permanent bank in October, 1914, when the deed was executed, was the average high water mark of the Yuba River at that time.

The evidence shows that the Yuba River at the location of the demised land has a broad bed of sand and gravel bordered on either side by permanent red earth banks 30 or 40 feet in height, and that the water usually flows down that bed in the rainy winter and spring months of each year in sufficient quantity to cover the entire bed from one bank to the other, and that a distinct water mark was visible along the base of the east bank in 1914 when the deed was executed.

Drury Butler, a civil engineer with about thirty-five years of practical experience, testified in detail to the character and appearance of the Yuba River, with which he had been familiar for many years. He described the broad graveled river bed with its high, almost perpendicular red earth banks on either side in the locality of the land in question. He said that the bed consists of loose gravel, sand and boulders washed out by the action of the water and containing no vegetation except occasional bunches of willow sprouts; that in the summer time during dry periods and low water the stream became comparatively small and often changed its course from one side of the river bed to another, sometimes forming false or temporary banks several feet in height which were usually leveled or swept away during high water; that the high water mark referred to in the deed is clearly visible along the base of the permanent right bank of the river. He said that he observed "wash on the bank itself, the bank is washed smooth". And he added that the washed portion is devoid of vegetation of any sort. He declared there was no vegetation growing on the sand bar, "not even weeds". To the question propounded to him, "Would, in your opinion, the high water overflow the (demised) land measured within the survey?" he replied, "Absolutely."

Mr. Waggoner, a reputable civil engineer from Nevada City, with forty-eight years of experience, who for many years served as California state debris commissioner, was familiar with the action of the Yuba River during that period of time. He corroborated Mr. Butler with respect to the bed of the river and the permanent and false banks thereof together with the effect of the volume of water flowing therein during the wet and dry seasons. He personally observed the flow of the river from 1907 to the time of the execution of the deed. He testified that the water often flowed from bank to bank, covering the entire gravel bed during the wet seasons. He said in regard to high water:

"The water flows from bank to bank. Q. Does that overflow this sand bar? A. It does, absolutely. . . . Q. In your opinion does the high water mark come up on that (permanent) bank every time there is high water? A. Certainly. . . . In 1907 the water covered everything in the bed. It was a moving mass of water."

He testified that the permanent banks and the natural flow of the river are now about the same as they were in 1914; that there was "very little change in them since then". He said the high water mark was plainly visible on those permanent banks, and that no vegetation grew on the sandy bed of the stream. He maintained a measuring gauge for many years in Deer Creek which is a stream tributary to Yuba River, and testified that his records showed high water in the years 1914 to 1917, inclusive, and in 1925 and 1928. The government statistics offered by the defendants corroborated the fact that there was high water in 1914.

James O'Brien, who had lived for 75 years at Smartville near the location of the land in question and whose father operated a placer mining enterprise just across the river from that point, testified regarding his observation of the action of the water in Yuba River for many years following 1909. He said he had often seen signs of high water marks on the permanent red earth banks in the vicinity of the demised property; that the high water mark "is on the red bank", and that at times of high water when it reaches that mark it would cover the entire sand bar four or five feet in depth. During his examination as a witness the following colloquy occurred:

"Q. Have you seen the river during the winter season when we have average rainfall, at high water mark? A. I have seen it at flood stage . . . going from bank to bank, . . . the red natural banks . . . Q. You think in ordinary high water marks the river runs from bank to bank, to your knowledge? A. Yes sir. . . . I think the average flood year the bar was covered every year, I don't think there is any question about it."

By the use of the terms "flood water" and "flood year", it is evident that the witness merely meant ordinary high water conditions. There is no evidence of what may be technically termed flood conditions with relation to that river.

W. F. Johnson acted as patrolman for the Pacific Gas and Electric Company in the vicinity of the land in question from 1908 to 1936. He was perfectly familiar with the water conditions of that river during that period. He testified that he often saw the water flowing in the channel from bank to bank, covering the entire gravel bed of the stream.

James M. Hapgood lived for 65 years at Timbuctoo near the location of the property in question. He testified that he had seen the water flowing from bank to bank several times, and that on those occasions the gravel bed of the stream was entirely covered. The following testimony was adduced in that regard:

"Q. When we have the average winter, the average run off and high water mark, would it overflow (the river bed)? A. Yes it would be all covered. . . . Q. On an average year when there is plenty of snow in the mountains, and you have the ordinary spring run off (is the sand bar covered)? A. Yes."

Joseph French, who had lived at Smartville for 35 years and who was familiar with the river in that vicinity, said he had seen the river nearly every day during that period, and that in the winter time he had often seen the river flowing from bank to bank, "touching the red bank", and completely covering the sand and gravel composing the bed of the stream. He testified that it was so in 1914, and that there was then "twenty-six feet of water in there".

While there may be some conflict of evidence furnished by the government statistics regarding the quantity of water which flowed in the Yuba River from year to year during the years from 1903 to 1914, from which it is argued that the *average* high water mark could not have been at the visible line on the permanent right bank of the stream which was determined by the court to have been the eastern boundary of the land according to the intention of the parties to the deed, the foregoing evidence sufficiently supports the findings and judgment of the court. This is certainly true if it is assumed, as we think it should be, that it was not the intention to refer to the *average* high water mark on that bank, but rather to the particular mark of high water which was visible on the bank when the deed was executed.

The question of the location of a boundary line of demised land is primarily determined by ascertaining the intention of the parties derived from the language of the deed, together with the surrounding circumstances. (*Miller & Lux, Inc.,* v. *Secara,* 193 Cal. 755, 762 [227 Pac. 171]; 18 C. J. 252, sec. 198.) If there is an ambiguity in the language of the deed the uncertainty should be determined favorable to

the grantee and against the grantor. (Sec. 1069, Civ. Code; *Serviss* v. *Jones,* 133 Cal. App. 640 [24 Pac. (2d) 881] ; 8 R. C. L. 1051, sec. 104.) In this case it was clearly the intention of the parties to bound the property conveyed on the east by the *"present* high water mark" on the permanent bank of the Yuba River.

It is reasonable to conclude that the description in the deed to the property in this case which bounds the land on the east by the "present high water mark *on the right bank* of the Yuba River" refers to the permanent red earth bank of the river and not to the temporary gravel bank at the margin of the summer flow of the stream. These permanent banks clearly mark the boundaries of the Yuba River in its ordinary annual flow augmented by the usual winter rains and melted snow supplied from its natural watershed. The evidence justifies the conclusion that the gravel river bed is ordinarily covered by water in the wet and rainy seasons. The condition of the gravel bed which is comparatively free from vegetation, and which reaches to the permanent banks on either side where visible marks of the washing water may be seen confirms that inference. ■ In the absence of language to the contrary, the bed of a nonnavigable river must be deemed to be bounded by the permanent banks which confine the waters in their course at their highest level. The banks of a river are the boundaries which confine the water to its channel throughout the entire width when the stream is carrying its maximum quantity of water. That definition is peculiarly applicable to those California rivers which depend upon periodical supply of water from winter rains and melted snow, and which diminish in the summer time to mere rivulets which aimlessly wander about over dry gravel beds. (*Ventura Land & Power Co.* v. *Meiners,* 136 Cal. 284, 290 [68 Pac. 818, 820, 89 Am. St. Rep. 128].) In the case last cited it is said:

"According to the most approved definitions, the banks of rivers or other water courses are 'those boundaries . . . which contain their waters at their highest flow'; or, as otherwise expressed by the same judge, they are 'the fast land which confines the water of a river in its channel or bed, in its whole width'. . . . 'By this term is understood what contains the river in its natural channel when there is the greatest

flow of water.' . . . 'The principle thus established is peculiarly appropriate to this state, where the changes in rainfall from year to year may be said to be periodical.' . . . Both definitions agree in holding that the bed of the river is bounded by the permanent or fast banks by which its waters are confined.''

The ordinary maximum flow of water in a river during the wet season of each year may not be deemed to be mere ''flood'' or ''storm waters''. The average level of the water attained by such a river in its annual seasonal flow establishes its high water mark as defined by the authorities. That rule is applied to the San Joaquin River, which is similar in character to the Yuba River, in the case of *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81, where at page 88 [252 Pac. 607], the Supreme Court said:

''The natural flow of water in the said San Joaquin river is, and has always been and always will be, if unobstructed, variable in quantity in the course of each and every year; that is to say, the same is, has been, and will be largest and most abundant at times of heavy rainfall over its watershed in said mountains in each winter season, and will also have a larger accretion in the spring and summer season by reason of the melting of the snows in said mountains; that these annually occurring accretions in the amount and flow of the waters of said river are natural and regular, and occur in their usual, expected, and accustomed seasons and result in an increased amount and flow of the waters of said river, . . . The conclusion is inevitable that the waters of the San Joaquin river annually flowing therein before and during and after these regularly occurring accretions in the volume thereof *constitute the usual and ordinary flow of said river and are in no sense 'storm' or 'flood' or 'vagrant' or 'enemy' waters as those terms are understood in law.* . . .

'' 'In the present case the storm and freshet waters are not something distinct and separate from the ordinary waters of the Fresno river. As a fact, and under the authorities, being annually recurring floods and freshets flowing in a clearly defined channel, *they constitute a part of the ordinary flow of the waters of such river.' ''* (Italics ours.)

We conclude that the *''present* high water mark on the right bank of the Yuba River''*, as that phrase is used in the deed of conveyance in this case, was intended by the parties

to refer to the visible mark thereof then existing and plainly visible on the permanent right bank of the river, and that there is sufficient evidence to support the determination of the court that the demised land is bounded on the east by that line. The findings and judgment quieting title in the plaintiff are adequately supported.

██ The appellants may not complain of the rejecting of numerous findings proposed by them for the reasons that they were argumentative, inconsistent with the judgment and many of them contain mere recitations of evidentiary facts as distinguished from ultimate facts. It is the established rule that ultimate facts, only, should be found. It is usually unnecessary and improper to incorporate evidentiary facts in the findings. Since the judgment is adequately supported by the findings which were adopted, and many of the findings which were offered by the appellants are in conflict with the judgment, and findings more specific than those which were adopted would have necessarily been adverse to them, it was not error for the court to reject the proffered findings. (*Hulen* v. *Stuart*, 191 Cal. 562, 572 [217 Pac. 750]; 24 Cal. Jur. 944, secs. 188 and 203.)

The judgment is affirmed.

Tuttle, J., and Pullen, P. J., concurred.