[S. F. No. 3688.  In Bank.—July 23, 1904.]

## LAGUNA DRAINAGE DISTRICT, Appellant, v. CHARLES MARTIN COMPANY, Respondent.

CONDEMNATION OF LAND FOR DRAINAGE DITCH—CONSTITUTIONAL QUESTIONS NOT INVOLVED.—In an action by a drainage district to condemn land situated outside of the district for the construction of a drainage ditch, the defendant cannot raise the question that the Drainage Act is unconstitutional in not providing for a notice of hearing, or for notice of any assessment that may be levied upon land within the district, to either of which notices he is not for any reason entitled.

ID.—PUBLIC USE—EFFECT OF LEGISLATIVE DECLARATION.—Section 1238 of the Code of Civil Procedure embodies a legislative declaration, that "draining and reclaiming lands" are public uses and constitute a matter of public utility and benefit, and the act of 1885 establishing drainage districts, and providing for the reclamation of lands for drainage ditches, is in harmony with that declaration, though such declaration is not conclusive as against one whose land is sought to be condemned.

ID.—POLICE POWER.—Drainage legislation is not only supported as being from a material point of view conducive to the public good; but is also within the police power of the state in the interest of public health.

ID.—LAND TAKEN BY PUBLIC CORPORATION—AGENCY OF STATE.—Under the act of 1885 the taking of the land of a private owner, by a drainage district for its ditch, is not for the private benefit of individual owners, but it is taken for the public benefit by a public corporation acting as an agency of the state for a public use; and that act is valid.

CXLIV. Cal.—14

ID.—COMMON BENEFIT OF INHABITANTS OF DISTRICT.—The claim that the drainage of the land will inure mainly to the benefit of those within the drainage district presents no valid reason against the condemnation of the land for a "public use," where all of the lands in the district are susceptible of one mode of drainage, and such a system for the common benefit is sought to be provided. It is no objection that the public benefit to be subserved is practically limited to those in the district whose lands are to be drained, and that they will thereby bo rendered valuable; but it is sufficient that all within the district will be in common benefited by it.

ID.—AREA OF DISTRICT—POWER OF LEGISLATURE.—It is no objection that the area of the overflowed land in the drainage district amounts to a fraction less than one hundred and sixty acres. The extent of the area of the land overflowed cannot affect the question of public use in providing for its drainage; and the legislature has power and full discretion to provide for drainage districts without reference to the extent of the flooded area.

APPEAL from a judgment of the Superior Court of Marin County. Thomas J. Lennon, Judge.

The facts are stated in the opinion of the court.

Thomas J. Geary, for Appellant.

Lippitt & Lippitt, for Respondent.

LORIGAN, J.—This is a proceeding brought by the plaintiff, a drainage district corporation, organized under the Drainage Act of this state, to condemn a strip of land belonging to the defendant for the purpose of constructing a drainage ditch. A general demurrer to the amended complaint was sustained, and from a judgment entered thereon in behalf of the defendant plaintiff appeals.

A dual attack was made upon the complaint under the demurrer in the lower court, it being insisted, first, that the act of 1885 (Stats. 1885, p. 204), under which the plaintiff district was organized, was unconstitutional, and, secondly, that if constitutional, still the complaint failed to show that the condemnation of the defendant's land was for any public use, but, on the contrary, it appeared therefrom that such condemnation was sought solely for private advantage and benefit, and it is urged here that the judgment should be sustained on either, or both, grounds.

As to the constitutionality of the act the point made is,

that it does not provide for notice to be given of a hearing on the petition presented to the board of supervisors for the formation of a drainage district, nor does it provide for a notice to the parties interested concerning assessments to be imposed upon the lands in the district, to be collected for the purpose of its organization.

If it were necessary to a disposition of this case to examine into the constitutionality of this act for failure to provide for a notice of a hearing, as claimed by appellant, we would approach the determination of that question with a great deal of hesitancy, realizing that the provisions for the formation of drainage districts, under the act of 1885, as far as the petition, notice of the application, publication, and the hearing by the board of supervisors are concerned, are identical with the provisions of the act of 1868 (Stats. 1868, pp. 514, 515, secs. 30, 31), relative to the formation of reclamation districts, as subsequently carried into and existing now under sections 3446 and 3447 of the Political Code. A vast number of reclamation districts have been organized under the provisions of the act of 1868, and the code provisions and the constitutionality in general of the act of 1868 was early but unsuccessfully questioned in *Hagar* v. *Board of Supervisors of Yolo County,* 47 Cal. 222, and has subsequently since been under review, but in no instance has any question ever been raised of its validity as far as the provisions for notice, or hearing of petitions for the formation of districts under it are concerned. Possibly it was deemed useless to raise that point, because, as all these districts are agencies created in behalf of the state, the rule laid down in *In re Madera Irrigation District,* 92 Cal. 323,[1] would doubtless apply, where it is said: "The constitutionality of the act in question is further assailed upon the ground that it makes no provision for a hearing from the owners of the land prior to the organization of the district. But the steps provided for the organization of the district are only for the creation of a · public corporation to be invested with certain political duties which it is to exercise in behalf of the state. . . . In the absence of constitutional restriction, it would be competent for the legislature to create such public corporation, even against the will of the inhabitants. It has as much power to

[1] 27 Am. St. Rep. 106.

create the district in accordance with the will of a majority of such inhabitants. It must be observed that such proceeding does not affect the property of any one within the district, and that he is not by virtue thereof deprived of any property."

But, without discussing this matter further, it is sufficient to say that, assuming that there was anything in this point, we do not think defendant is entitled to raise it. The only object of the proceeding under the petition was to establish a public corporation. Its establishment did not affect the property of any person, even within the district, or deprive any one therein of his property; it simply authorized the corporation to discharge the public purposes for which, as a state agency, it was created. Respondent's land was not embraced within the district. Neither he, nor it, was affected by the organization, and he has no ground to complain that the statute failed to provide for a notice of hearing to which he was not, for any reason, entitled.

Neither is it of concern to him that the statute fails to provide for notice of any assessment that may be levied. Such assessments can only be levied upon the land within the district. He has no land therein, and whether an assessment is ever levied, or levied with or without notice, cannot be of a particle of interest to him as affecting any of his legal rights.

It is further insisted, however, against the constitutionality of the act, that it nowhere appears therefrom that, in providing for the organization of drainage districts and authorizing them to exercise the right of eminent domain, any public use is to be subserved for which private property may be taken under section 14 of article I of the constitution, which provides that it may be only so taken for a "public use."

But, testing again the provisions of this act of 1885 by the provisions of the act of 1868, which, as we have above stated, were upheld, we find no substantial difference in their respective provisions as to the purposes for which the respective organizations could be created. In fact, the only difference in them is, that the act of 1868 in terms referred to the reclamation of "swamp and overflowed, salt, marsh, or tide lands" as such, and authorized the formation of a reclamation district upon petition of the owners of one half of any such body of land "susceptible of one mode of reclamation." The

act of 1885 in question is not, however, limited to the creation of districts for the drainage of any particular kind of land, but provides that on the petition of "the owners of two thirds of any body of land susceptible of one mode of drainage" and compliance with further provisions, they may be created. It was doubtless on account of the provision as to the character of land which might be reclaimed under the act of 1868, and a possibility of the act being inapplicable to the reclamation of lands other than those, that the act of 1885 was passed. In other respects their provisions are practically identical; the act of 1885 having apparently been modeled after the act of 1868, because the latter contained appropriate legislation for the same general purpose which was intended to be accomplished by the former, and such legislation had already received judicial sanction. Both acts, too, provide for the reclamation—because the term "drainage of land" has practically the same application as "reclamation"; the one is the means employed, the other the result—of bodies of land susceptible of one mode of reclamation. Now in discussing the validity of the act of 1868 it was said in *Hagar* v. *Supervisors of Yolo County,* 47 Cal. 222, "But we think the power of the legislature to compel local improvements which, in its judgment, will promote the health of the people, and advance the public good, is unquestionable. In the exercise of this power it may abate nuisances, construct and repair highways, open canals for irrigating arid districts, and perform many other similar acts for the public good, and all at the expense of those who are to be chiefly and more immediately benefited by the improvement. . ... The reclamation of the vast bodies of swamp and overflowed land in this state may justly be regarded as a public improvement of great magnitude, and of the utmost importance to the community. If left wholly to individual enterprise it would probably never be accomplished; and in inaugurating so great a work, the legislature has pursued, substantially, the same system adopted in other states for the reclamation of similar lands—to wit, by dividing the territory to be reclaimed into districts, and assessing the cost of the improvement on the lands to be benefited."

Now, while the decision above quoted from speaks of the public benefit to be derived from the reclamation of vast bodies of swamp and overflowed lands, the terms of the act

did not particularly provide for the organization of districts only where such vast tracts were sought to be embraced within their limits. There was nothing said in the act as to quantity. In fact, while the general scheme doubtless contemplated that ultimately vast tracts would be reclaimed, it was equally contemplated that this result would be accomplished gradually through the medium of various special separate and independent districts formed under the act. This, of course, would promote the public good. But the public good is equally to be attained under the act of 1885, because it is provided by section 1238 of the Code of Civil Procedure that "the right of eminent domain may be exercised in behalf of the following public uses: 4. . . . draining and reclaiming lands." This is a legislative declaration that, in general, "draining and reclaiming lands" in this state is a matter of public utility and benefit, and the act of 1885 is in harmony with this declaration.

On account of the climatic conditions and the topography of this state, the legislature recognized that there were other areas of land not consisting of "swamp, salt, marsh, or tide lands" which it was equally for the material advancement of the public interests and for the benefit of the public health should be drained, and this object was to be attained under the provisions of the act of 1885. It is to the interest of every state, and, hence, conducive to the public good, that all its land should be utilized and made productive, and this end attained in any particular locality or localities is a benefit to the entire state. A moment's thought will suggest that whatever tends to increase the area of cultivable land materially adds to the productive capacity of the state, increases her resources, induces settlement, promotes her industrial energies, and enlarges her revenue.

And whether legislation operates to facilitate the draining of land so as to adapt it to cultivation, or to irrigate it so as to promote its productiveness, the same principle applies, and the end to be attained is the same, public prosperity and welfare. As said in the Madera case, 92 Cal. 313: "Whether the reclamation of the land be from excessive moisture to a condition suitable for cultivation, or from excessive aridity to the same condition, the right of the legislature to authorize such legislation must be upheld upon the same principle,

namely, the welfare of the public, and particularly that por-
tion of the public within the district affected by the means
adapted for such reclamation.''

And not only is drainage legislation supported as being,
from a material point of view, conducive to the public good,
but it is equally sustained as being within the exercise of the
police power of the state—in the interest of public health.

Ponds, marshes, and low swampy places are generally recog-
nized as a menace to the public health of the neighborhood in
which they exist as generating malaria, and, hence, it is mat-
ter of public interest that they should be abated and removed.

These are the main grounds upon which such legislation is
sustained. In Lewis on Eminent Domain, 2d ed., vol. 1, sec.
188, speaking on this general subject, it is said: ''The promo-
tion of the public health is undoubtedly a public use within
the meaning of the constitution, and private property may be
taken for the construction of drains, levees, or other works
in order to accomplish this object. . . . As wet lands are
undoubtedly unhealthful, it is evident that the public health
may be made the real or ostensible ground of nearly all the
drainage laws which have ever been passed. It is never an
objection to the exercise of the power of eminent domain that
it is instigated by private persons whose private interests will
thereby be promoted. So a drain which will, in fact, pro-
mote the public health is none the less a public use because it
is -sought by particular individuals whose estates will be
thereby improved. Most drainage laws, however, are not con-
ditioned upon the public health. Some of these laws permit
any one or more persons to construct a drain across the land
of others without any consideration of the public health or
public welfare. Such statutes clearly permit the taking of
private property for private use, and are void. On the other
hand, a drain through a large tract of wet or swamp land
belonging to numerous proprietors into which all can drain
whose lands incline towards it will seem to be a public use,
although the only object accomplished is the drainage and
improvement of private property. As has been already ob-
served, a public use does not necessarily mean for the use of
the entire community, but for the use of all within a given
locality. Thus, a drain for the use of all within a certain
district is as much a public use as a schoolhouse for the use

of a particular school district. . . . The drain is for those who have land needing drainage within the drainage district. . . . The improvement of the land in a particular locality is of benefit to the whole state. . . . Therefore, it seems to us that a law which provides for the drainage of a given district by means of drains which are for the common use of all the lands within the district is valid as effectuating a public use within the meaning of the constitution. But a law which enables one or more proprietors to construct a drain across the lands of others for the benefit of their particular estates is void as authorizing a taking for a private purpose. A law such as we have indicated would be valid might be special, designating the particular district to be drained, or general, providing for the organization of drainage districts of a quasi-public character.''

The legislation referred to in the latter part of this quotation from Lewis is of the kind embraced in the act of 1885, and which is designed to effect the drainage of a district by means of a common drainage system for the use of all the lands therein, to be accomplished by drainage districts of a public character organized under the act for that purpose.

Nor is it necessary that the act should declare in terms that it is enacted for the public good or welfare, or that the right of eminent domain conferred under it should be expressly declared to be for a public use. It is sufficient if from all the provisions of the act it reasonably appears that it is for that purpose, and, for the reasons which we have heretofore given, and under the authority cited, we are satisfied that it sufficiently so appears.

Counsel for respondent contends that the act of 1885 is no more valid from a constitutional point of view than the Drainage Act of 1881 (Stats. 1881, p. 15), declared unconstitutional in *Nickey* v. *Stearns Ranchos Co.,* 126 Cal. 150. The essential difference between the two acts, however, is, that the act of 1881 conferred the right of eminent domain upon individual owners for the benefit of their private estates, and was therefore void, as taking the lands of a private owner for individual benefit. Under the act of 1885 the right to take the land of a private owner is to be exercised by a public corporation, acting as an agency of the state for a public use, and hence is valid.

The other point urged by respondent that the order over-ruling the demurrer was proper because the complaint does not show that the condemnation of the land of defendant is for any public use, but on the contrary it appears therefrom that it is solely for the private benefit of a few individuals, we do not think calls for any particular consideration, and we gather from the briefs that this was not at all made the basis for sustaining the demurrer by the lower court. In the opening brief of appellant it is stated that the demurrer was sustained on the ground that the act of 1885 was unconstitutional. This statement is not specifically denied by counsel for respondent in their reply brief, and as it appears that the demurrer was sustained without leave to amend, and that both sides on this appeal have devoted their attention principally to a discussion of the constitutionality of the act, this would appear to be the fact. The order sustaining the demurrer is, however, general, and counsel for respondent presents the point.

While it is true that the mere declaration of the legislature that the purpose for which property may be taken is a public use is not conclusive, and does not conclude a person whose land is being condemned from showing upon the trial that, as a fact, the use sought to be subserved is a private one (*County of San Mateo* v. *Coburn,* 130 Cal. 634), or from assailing the complaint on the ground that it so appears therefrom, still we think that the complaint at bar is not open to this attack.

Most of the objections in this regard are disposed of in our discussion of the constitutionality of the act. The claim that the drainage of this land will, from the facts of the complaint, inure mainly to the benefit of those within the district, presents no valid reason why the right of eminent domain for that purpose is not being properly exercised in behalf of a "public use," where all the lands within the district are susceptible of one mode of drainage, and such a system for the common benefit is sought to be provided. (1 Lewis on Eminent Domain, 2d ed., sec. 188.) Nor is it any objection that the public benefit which is to be subserved is practically limited to those in the district whose lands are to be drained, and which will thereby be made valuable. In order that it shall constitute a public use it is not necessary that the ad-

vantages derived from the contemplated public improvement shall extend as effectually to the community outside the district as to those in it. It need not extend to the whole public or to any large portion of it. It is sufficient that all within the district will be in common benefited by it. (1 Lewis on Eminent Domain, 2d ed., sec. 188; *In re Madera Irrigation District,* 92 Cal. 323.[1])

Neither can it be said because the area of overflowed land embraced in the district amounts to a fraction less than one hundred and sixty acres that the object of the district in this proceeding is not effectuating a public use within the meaning of the constitution. The area of a drainage district is not a matter from which, of itself, it can be determined whether the district corporation is exercising the right of eminent domain for the private advantage of the owners within its territory, rather than as a public agency exercising it for a public use. It is apparent from the act that it contemplates by its provisions a subdivision of the state into districts, so that the lands which, by reason of natural conditions, are capable of one common system of drainage shall be embraced in one district; but of course, in the nature of things, these districts could not be expected to be all of the same area; in organizing these districts there would have to be taken into consideration the area of overflowed land as it existed, be it great or small, which was capable of drainage under one practical common system, and under the terms of the act it is made the duty of the board of supervisors in providing for the organization of the district, with a view to having all the land capable of one mode of drainage included therein, to see that no land is excepted from such district which should properly be included therein, and to exclude all land improperly included, so that the mere area of the land overflowed could not affect the question of public use in providing for its drainage.

The legislature had authority to provide for the organization of these districts, and as there is no constitutional prohibition as to the mode of organization, or as to the amount of overflowed land necessary to constitute a district, legislation on these matters was entirely within its discretion. In harmony with that discretion it provided for drainage without

[1] 27 Am. St. Rep. 106.

relation to the extent of the flooded area, requiring only in that regard that the district should consist of land susceptible of one mode of drainage, and that all lands properly cap-- able of drainage, by such common system should be included in the district; and it cannot be said, as matter of law, from the simple fact that a given overflowed area may be comparatively limited in extent, that a drainage district embracing it alone could not be created, and vested with the power of eminent domain, to promote a public use, under the act.

We are of the opinion that the court erred in sustaining the demurrer to the complaint, and the judgment is reversed, with directions to the lower court to overrule the demurrer.

Shaw, J., McFarland, J., Van Dyke, J., and Henshaw, J., concurred.