[Civ. No. 8651.  Third Dist.  Feb. 21, 1956.]

B. F. PERRY et al., Appellants, v. THE STATE OF CALIFORNIA et al., Respondents.

Frank K. Richardson for Appellants.

Edmund G. Brown, Attorney General, Paul M. Joseph, Deputy Attorney General, Bruce F. Allen, for Respondents.

VAN DYKE, P. J.—Plaintiffs brought this action to quiet their title as against the state and respondent Warner to a parcel of land described by metes and bounds which presently lies on the river side of a levee erected by a reclamation district along the westerly margin of the Mokelumne River just below its junction with Georgiana Slough in Sacramento County. Plaintiffs claim title by virtue of a quitclaim deed from Golden State Asparagus Company, a corporation, which corporation owned that portion of Swamp and Overflowed Land Survey Number 943 westerly of the junction of Georgiana Slough and the Mokelumne River. If the parcel quitclaimed to plaintiffs formed a part of that survey then plaintiffs' title is good. Judgment went against plaintiffs and from that judgment they prosecute this appeal.

When on September 9, 1850, California was admitted to the Union she took title as sovereign to lands within the beds of Mokelumne River and Georgiana Slough, both navigable streams. That title covered the beds and the banks of the streams, the banks being those portions of the shore lying below mean high tide. On September 28th following, by virtue of the Swamp and Overflowed Land Act she took title to swamp and overflowed lands along said streams. Congressional legislation granting said lands (see 43 U.S.C.A. "Public Lands," § 982 et seq.) declared that to enable the several states to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein the whole of such lands "made unfit thereby for cultivation, and remaining unsold on or after the 28th day of September, A. D. 1850," were granted and belonged to the several states respectively, in which said lands are situated. Although the act was construed to be a grant *in praesenti* it was apparent that the general description contained in the legislation would not serve to specifically describe such tracts of land as might in fact come within the general description. Accordingly, it was provided that it would be the duty of the Secretary of the Interior to make accurate lists and plats of all such lands and to transmit the lists to the governors of the several states in which such lands might lie; and at the request of the governor of any state to cause patents to be issued to said state for such lands, conveying thereby the fee simple title

to said lands. Other provisions were contained in the legislation to aid in the segregation of such lands from the general body of lands owned by the federal government and to confirm title to the states. The act did not apply to nor convey title to land within the beds of navigable streams, including the banks thereof, below mean high tide, for such lands were held by the state as an attribute of its sovereignty and the title thereto originated with the admission of the state to the Union. The foregoing propositions are well decided and reference may be made to the language of the act and to the case law developed after the passage of the act, a partial, but sufficient, reference being as follows: *Rogers Locomotive Mach. Works* v. *American Emigrant Co.*, 164 U.S. 559 [17 S.Ct. 188, 41 L.Ed. 552]; *Owens* v. *Jackson*, 9 Cal. 322; *Summers* v. *Dickinson*, 9 Cal. 554; *Kernan* v. *Griffith*, 27 Cal. 87; *Sacramento Valley Reclamation Co.* v. *Cook*, 61 Cal. 341; *Tubbs* v. *Wilhoit*, 73 Cal. 61 [14 P. 361]; *Foss* v. *Johnstone*, 158 Cal. 119 [110 P. 294]; *Ferry Pass Inspectors & Shippers' Assn.* v. *White River Inspectors & Shippers' Assn.*, 57 Fla. 399 [48 So. 643, 22 L.R.A.N.S. 345].

In 1868 Survey Number 943 of Swamp and Overflowed Lands, covering land lying westerly of Georgiana Slough and Mokelumne River, was made by the County Surveyor of Sacramento County, and in 1873 patent to lands within the survey, comprising something over 2,000 acres, was issued by the state. The description began at a described point and, so far as material here, proceeded by metes and bounds to "the west bank of Georgiana Slough . . . thence downstream . . . to the Mokelumne River, thence downstream" to a point on the river, where the survey left the river and went to the point of beginning. It is claimed by plaintiffs that this swamp land survey included the land to which they herein seek to quiet title. Whether or not it did was the sole issue between the parties. At the point of junction between Georgiana Slough and Mokelumne River and extending downstream from or off the point of junction the record is clear that from beyond the memory of living witnesses there existed a body of land narrow but extending down river for a considerable distance which may have been at the critical date, September 28, 1850, a part of the westerly bank of the Mokelumne River. If it was then it was included within the swamp and overflowed lands survey and plaintiffs should have had their title quieted. If, on the contrary, it lay offshore from the westerly bank and within the banks of the

river, then it was not included in the swamp land survey and the judgment of the trial court which quieted title in the state must be affirmed. The testimonial evidence introduced came from witnesses whose acquaintance with the locale went back to the early 1900's. These witnesses testified from memory as to the elevation of the land above mean high tide and as to the contiguity or lack thereof with the land to the west. It appeared from this evidence that, beginning with the point of confluence of the two streams, the land was above mean high tide, the elevation gradually lessening downstream until the lower end of the parcel lay below mean high tide. As to the juncture of the parcel with the mainland, the evidence of these witnesses was in conflict, some stating positively that prior to the raising of the old levee along the Mokelumne the parcel was annexed to and a part of the mainland, while others testified that most, if not all, of the parcel was separated from the mainland by a water channel that was not produced by dredging, but by nature. Insofar as such testimony could afford an inference as to the condition existing in 1850 it was admissible, but obviously it was of little value and that it was conflicting was to be expected. The westerly river levee was raised by dredger action in 1907 and 1908, which time marked about the limit that the witnesses attempted to go back to in memory. This evidence left a gap of more than half a century between the time these witnesses made their observations to which they testified and the critical point of time when title passed to the state, including or excluding the parcel, according to whether or not it was then a part of the mainland or lay within the river. These witnesses variously described the growth of vegetation upon the parcel. Some said that in the early 1900's they observed willow and alder trees of considerable size growing upon the parcel, while others said that it was to a great extent covered only with tules, indicating, as they said, that in such portions it lay below mean high tide. But quick-growing trees and vegetation of the kind described seen 50 years after the critical date make weak evidence upon which to base an inference as to the condition of the parcel a half century before.

United States Geodetic surveys of the area, including the junction of the Georgiana Slough and the Mokelumne River, which were introduced in evidence, and of which courts take judicial notice, indicate that the general level of the land lying westerly of the streams, which we have called the main-

land, was below what the surveys designate to be "sea level" and since there is no dispute but that these lands, though swamp and overflowed were not, save in flood times, under water, it is apparent that the stream banks, by stream action, were above the general level of the land lying landward from them. This is a common phenomenon in the area.

The testimony taken clearly showed that there was a difference between the elevation of the northern end of the tract, beginning at the point of stream confluence, and the elevation of the southern end. Plaintiffs' parcel, as definitely described in their complaint, constitutes the more southerly portion of the entire parcel and as to it there was testimony that, within the memory of the witnesses, parts of it, the more northerly parts, were covered with brush and trees and lay above the tides, whereas increasingly as one went south to the southern tip of the parcel the elevation lowered until the southern tip was covered only with tule growth and emerged only when the high tides receded.

In the hundred years elapsing between the federal grant to the state and the trial of this action many floods have descended the river and have overflowed its banks and the lands lying without them. What the effect of these violent intrusions of flood waters may have been is not shown in the record, but commonsense tells us that significant changes may have occurred. When one attempts at this date or at any time covered by the official surveys and plats and the testimony of witnesses to reconstruct those past conditions the task proves to be practically impossible of performance. The earliest surveys are the goedetic surveys we have mentioned and they go back to 1906, 56 years after the critical date.

The trial court found that the land owned by plaintiffs had never been a part of the mainland westerly of the western bank of the Mokelumne River, but that it was part and parcel of the river bed itself; that it had lain below the level of mean high tide in the river; that this situation existed in 1850, and that, therefore, the parcel had never been a part of Swamp and Overflowed Land Survey Number 943; that the parcel was part and parcel of the river bed between its banks, and title thereto had vested in the state upon the state's admission in the Union and had not been conveyed away by the swamp land patent.

We have been at some pains to depict the situation presented by the record in the way of evidence upon which the

court could base its conclusions as to whether or not plaintiffs' land had passed from the state by the swamp land patent. We have done this because we have concluded that in ruling upon the motion for new trial made after the decision of the cause the trial court erred in not granting the motion or at least in not setting aside its findings, conclusions and judgment to receive and consider the evidence then known to be available. Plaintiffs moved the court for a new trial, alleging that they had discovered evidence not before known to them which would compel a judgment in their favor. In support of the motion plaintiffs presented affidavits of two proposed witnesses. We will refer to one of these affidavits at some length. Substantially, and so far as material here, the two affidavits were identical. Walter W. Weir averred as follows: He is a registered civil engineer and a drainage engineer in the Department of Soils, College of Agriculture, University of California, and since 1915 has been a member of the faculty of the university and a member of the staff of its Agricultural Experiment Station; since 1915 also he has devoted his entire time to the study of California soils; he has made numerous and extensive studies of soils in the delta area of California, has traveled through the area extensively and is thoroughly famiilar with it from his years of experience and familiar also with the topography and the soil formation of the area; he has published monographs concerning delta conditions and containing soil survey reports generally in California; he has studied the composition and formation of soils, particularly in the delta area, having begun his delta area studies in 1921; he has visited the so-called "Perry Berm" or "Perry Island" (the parcel of land with which we are concerned here), situate on the westerly side of the Mokelumne River just south of its confluence with Georgiana Slough and on at least two occasions has made an examination and tests of the soil on the berm by making test borings. He has also made test borings of and examined the soil of Andrus Island (which we have called the "mainland") and he has for a considerable period of time studied the berm and its relation to the Mokelumne River and to Andrus Island; basing his opinion upon his acquaintance with the delta area with the berm and upon his examination of the soils and topography aforesaid and upon his examination of the property in controversy, and upon maps and photographs of the area he states it to be his opinion that the berm has "from time immemorial been a part of and

affixed to Andrus Island"; that in his opinion the westerly bank of the Mokelumne River from time immemorial has been in the present location of the easterly bank of the so-called Perry Berm and that from time immemorial the berm has been a part of Andrus Island situate to the west of the westerly bank of the Mokelumne River; in his opinion the ground surface of Perry Berm and adjacent Andrus Island were before reclamation at about the level of mean high tide which was also the general level of unreclaimed delta land in the area generally; the position of the berm is on the outer perimeter of a bend of the river at its confluence with Georgiana Slough and is on the opposite side of the river from that on which any accretion would naturally occur; the natural action of the river at the berm would be one of cutting rather than accretion and that "the only scientifically accountable way to explain the presence of said Berm is that it has been from time immemorial a part of Andrus Island and that it is highly improbable that any such Berm could have been formed in the location of said Berm by the accretion action of the Mokelumne River." He says these conclusions are scientifically confirmed by the nature of the soil of the berm, which is identical with the soil on Andrus Island immediately to the west of the berm; that the soil is Columbia silt loam and that such soils are characteristically found adjoining the banks of rivers and sloughs generally throughout the delta area; that it is apparent to him the so-called slough separating the present berm and Andrus Island is artificial and man-made and is in fact a dredger cut and not a natural watercourse formed in its length and shape by the action of the river; that it is equally apparent from an examination of the early maps, including the quadrangle map of the geological survey easterly of the critical point on the river that the said slough was cut by dredger and the separation of the berm from Andrus Island is and was artificial and not caused by any act of nature; that such works of reclamation whereby strips of land are left riverward from the levee is common in the area and is done for the purpose of protecting the levees from the force of wave action by the waters of the rivers and streams and to protect against the cutting and eroding force of streams on the outer banks of bends and curves in the rivers. He concludes that for the foregoing reasons it appears to him that no other conclusion than as stated can be scientifically supportable.

The other affidavit presented was that of Lloyd N. Brown, a scientist of standing and experience comparable to the standing and experience of Mr. Weir, who states that he also has made special studies of the delta area, including examination and making of test borings on the berm and the adjacent mainland, and he agrees fully with Mr. Weir that from time immemorial the berm has been a part of the mainland and westerly of the bank of the Mokelumne River.

We see no reason, and think there can be no reason, to doubt that the only really valuable evidence that can now be obtained as to conditions existing in 1850 must proceed from scientists who by application of their special skills can tell the triers of fact what conditions existed at that time. This is so because that point in time is far beyond the memory of living men; and far beyond the dates of existing documentary evidence of investigations made by public agencies such as the United States Geological Survey. Such reading of the rocks and soils has been developed to a high point of accuracy. Surely such scientists can tell us whether or not the parcel of land in controversy formed a part of the western bank of the Mokelumne River in 1850. The two affiants whose statements we have related have no hesitancy in saying that they can and have determined from their named sources of information what the truth is concerning the location of the western bank of the Mokelumne River in 1850. Their affidavits do not go into such detail as they might go into upon direct and cross-examination, but there seems no reason to doubt that these men believe they can find the truth that is at issue here.

Respondents argue that the scientists' evidence was not newly discovered and that the court was fully justified in refusing to reopen the case and permit its introduction. They say that expert testimony is always known to exist. Perhaps in strict theory this argument may be sound, but in practical effect it may well be that the existence of this source of scientific information was actually, as appellants declare it was, unknown to them and their counsel. On the other hand, by the argument of the state the existence of this information was known to the state and instead of bringing it forward in aid of the court the state chose to depend upon the failing memory of aged men and such conclusion as their own expert witnesses could draw from the existing maps and photographs of the general area which on so fine a point as was in issue here must have amounted

in the main to nothing more than generalizations. Respondents themselves were obligated to present to the trier of fact the best evidence available. In the last analysis we are not so much concerned with technical rules as to who shall present evidence and as to who shall be charged with failure to produce the best evidence as we are with the right decision of issues presented in actions which involve to the parties concerned values far greater than those which lie within strict subservience to the rules of procedure. By the decision appealed from appellants lose the property which they have expensively improved. They testified that they bought their land after making what seemed to them reasonable inquiries as to whether it was owned by their predecessors in interest; that they concluded that it was so owned and then proceeded to develop their parcel as a fishing resort and yacht and boat harbor. They say they employed a dredger to erect a substantial levee entirely around the parcel, built their home on the northerly part of it and established a bridge from the mainland to it across what they claim to be the dredger cut, built slips for boats, and a drydock for their repair, and made other installations, all in the belief that they owned the property they were thus improving. Their home and their business they say have been created during the six years intervening between the date they took their deed and the date when, in the face of a challenge as to their ownership, they began this action, during which interval of time, they testified, no protest was made by the State of California to their activities. There may, of course, be an adequate answer to all this which is frankly argumentative, and we set it out only to emphasize the point we make that it is important that parties' causes be decided by the use of qualified evidence, and that the best available. This cause has not been tried to a jury and upon the motion for new trial it would have been a simple matter to set aside the findings, conclusions and judgment in order to receive the evidence offered. In our view it was error to refuse to do so.

The judgment is reversed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied March 21, 1956, and respondents' petition for a hearing by the Supreme Court was denied April 18, 1956. Traynor, J., and McComb, J., were of the opinion that the petition should be granted.