[No. A026746. First Dist., Div. One. Mar. 21, 1986.]

RAYMOND R. LYON et al., Plaintiffs and Appellants, v.
WESTERN TITLE INSURANCE COMPANY,
Defendant and Respondent.

COUNSEL

Joseph M. Gughemetti for Plaintiffs and Appellants.

Steven R. Walker, Silverman, Walker & Teller and Leland, Parachini, Steinberg, Flinn, Matzger & Melnick for Defendant and Respondent.

OPINION

**ELKINGTON, J.**—Many years ago the State of California granted title to a patent applicant of about 500 acres of land, between the high water mark and low water mark at the southern end of Clear Lake in Lake County. At the time, as it does now, Civil Code section 830 provided that such a grantee "takes to the edge of the lake . . . at low water mark." And it was judicially determined law that the land between the high and low water mark of the lake was "irrevocably conveyed into absolute private ownership" (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 482 [91 Cal.Rptr. 23, 476 P.2d 423]) with "unrestricted title to the grantee" (*Alameda Conservation Assn.* v. *City of Alameda* (1968) 264 Cal.App.2d 284, 287 [70 Cal.Rptr. 264], overruled on other grounds in *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 532 [162 Cal.Rptr. 327, 606 P.2d 362]), "to the low-water mark" (*United States* v. *Gossett* (C.D.Cal. 1967) 277 F.Supp. 11, 13), and "to the edge of the lake . . . at low-water mark" (23 Ops.Cal.Atty.Gen. 306, 307 (1954)).

And when such grants by the states are made, the states may *not* constitutionally "impair the efficacy of the grants, or the use and enjoyment of the property, by the grantee." (*Packer* v. *Bird* (1891) 137 U.S. 661, 669 [34 L.Ed. 819, 821, 11 S.Ct. 210].)

Following mesne conveyances of the 500 acres, Raymond R. Lyon and Margaret E. Lyon, his wife (hereafter for convenience in the singular, Lyon), purchased the property in 1964, relying on the then law's provision that they were taking absolute title to the lake's low water mark. But then in 1981, the state's Supreme Court in *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239] (hereafter *Lyon*) rejected the earlier settled law, holding that although title had passed, it was taken subject to a public trust requiring him to restore the land to, and preserve it in, *its "natural state."* Lyon, and others similarly situated,

are thus deprived of any beneficial use of the land they had bought and paid for, under the law's assurance that they were acquiring absolute title to the lake's low water mark.

Few would deny the right of the state, under lawful procedures, to retake such land for a public purpose or need. But few also would quarrel with California's Constitution, article I, section 19, which commands that: "Private property may be taken . . . for public use *only* when just compensation [is] paid to . . . the owner." (The italics is ours.)

 It is the public policy of this state that an opinion of its Courts of Appeal shall be published, among other reasons, if it "criticizes with reasons given, an existing rule" of law. (Rule 976(b)(1), Cal. Rules of Court.) We have certified this opinion for publication for, respectfully, it criticizes with reasons given the rule announced by *Lyon.*

In the *action presently before us,* the demurrer of defendant Western Title Insurance Company (hereafter Western) to the first amended complaint (hereafter complaint) of Lyon was sustained by the superior court. Lyon declined to amend his complaint and judgment of dismissal of the action was entered. The instant appeal was taken by Lyon from the judgment of dismissal.

We recount what will reasonably be termed the historical-factual-procedural-legal context of the appeal.

Following our War of Independence the 13 newly created states became the owners of the ocean tidelands bordering upon them, of the navigable waters lying within their borders, and of the land below the natural high water lines of their navigable inland lakes and streams. And upon the adoption of the federal Constitution, the United States similarly held such waters and lands of its nonstate territories in trust for states which might be created in the future. Upon California's admission to the Union in 1850, it succeeded to such tidelands, and water and lands within its borders, upon an "equal footing" with other states. (*Montana* v. *United States* (1981) 450 U.S. 544, 551 [67 L.Ed.2d 493, 501, 101 S.Ct. 1245].)

But such rights which were granted to, or held by, the several states were nevertheless subject to the transcendent authority of Congress over *navigable* waters, i.e., "to regulate commerce with foreign nations, and among the several states" (U.S. Const., art. I, § 8, cl. 3; *Montana* v. *United States, supra,* at p. 551 [67 L.Ed.2d at p. 501]). As to the inland waterways coursing upon two or more states, the federal interest in retaining control over commerce and navigation was substantial; however, as to *navigable*

lakes and streams contained *wholly* within a state, Congress neither had, nor imposed, any authority.

"If they [the states] choose to resign to the riparian proprietor, rights which properly belong to them in their sovereign capacity, it is not for others to raise objections." (*Barney* v. *Keokuk* (1877) 94 U.S. 324, 338 [24 L.Ed.224, 228].) "This rule has been followed consistently." (Note (1982) 70 Cal.L.Rev. 1138, 1141.) "[I]t depends on the law of each state to what waters and to what extent this prerogative of the state over the lands under water shall be exercised." (*Hardin* v. *Jordan* (1891) 140 U.S. 371, 382 [35 L.Ed. 428, 433, 11 S.Ct. 808].) "[I]t has become established almost without argument that . . . the effect of the grant on the title to adjoining submerged land will be determined by the law of the state where the land lies." (*Hardin* v. *Shedd* (1903) 190 U.S. 508, 519 [47 L.Ed. 1156, 1157, 23 S.Ct. 685].) And when such grants by the states are made, the states may *not* constitutionally "impair the efficacy of the grants, or the use and enjoyment of the property, by the grantee." (*Packer* v. *Bird, supra,* 137 U.S. 661, 669 [34 L.Ed. 819, 821].)

The courts of California had long been in agreement.

"The administration of [the entrusted submerged lands] by the state is committed to the Legislature, and a determination of that branch of government made within the scope of its powers is conclusive in the absence of clear evidence that its effect will be to impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes. . . . In such a case the state through the Legislature may find and determine that such lands are no longer useful for trust purposes and free them from the trust. When [such lands] have been so freed from the trust . . . they may be *irrevocably conveyed into absolute private ownership.*" (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482, and see fn. 17.) "The attitude of the Supreme Court of the United States has been consistent in leaving the question of private water rights, *which do not involve federal or interstate interests, to the control of local state policies.*" (*Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 366 [40 P.2d 486], and see authority there collected.) "Although a state owns the lands underlying its bays . . ., it holds them in trust for the public for purposes of navigation and commerce. . . . *But this trust is terminable.* Upon proper legislative determination, *such lands may be transferred by the state free of the trust.* Conveyance of like lands under the acts of 1868 and 1870 *does in fact so terminate the trust and pass unrestricted title to the grantee.*" (*Alameda Conservation Assn.* v. *City of Alameda, supra,* 264 Cal.App.2d 284, 287.) And when a grant or patent of land sometimes submerged by an adjoining watercourse is issued by the state, it conveys "*the fee simple title to said*

*lands."* (*Perry* v. *State of California* (1956) 139 Cal.App.2d 379, 380-381 [293 P.2d 480].) (The italics of this paragraph are ours.)

"[T]he same incidents of the trust applicable to tidelands also apply to nontidal navigable waters." (*Lyon, supra,* 29 Cal.3d p. 231.)

Long ago (1874), the Legislature of California enacted Civil Code section 670 which iterated, as here relevant, the above-noted rule that upon the state's admission to the Union, it became the absolute owner of land below tide water and below the water of all navigable lakes and streams lying wholly within its borders. The statute, as here relevant, declared: "The State is the owner of all land below tidewater, and below ordinary high-water mark, . . .; of all land below the water of a navigable lake or stream."[1]

But contemporaneously with Civil Code section 670 the Legislature chose to treat differently the land below tidewater, and land below its inland navigable lakes and streams. While retaining title to land below tidewater, by enactment of Civil Code section 830, it ceded to the riparian owners of the state's inland navigable streams and lakes, all land between their high and low water marks. Section 830, as here relevant, has since provided that where a riparian owner's land "borders upon a navigable lake or stream . . ., *the owner takes to the edge of the lake or stream, at low water mark,* . . ." (The italics are ours.)[2]

And with the adoption of Civil Code section 830, the Legislature (1874) amended Code of Civil Procedure section 2077, subdivision 5, to read, as relevant: "When a navigable lake . . . is the boundary, the rights of the grantor *to low-water mark* are included in the conveyance."[3]

---

[1]Civil Code section 670, in its entirety, states: "The State is the owner of all land below tidewater, and below ordinary high-water, bordering upon tidewater within the State; of all land below the water of a navigable lake or stream; of all property lawfully appropriated by it to its own use; of all property dedicated to the State; and of all property of which there is no other owner."

[2]The full text of Civil Code section 830 recites: "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high-water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."

[3]The entire relevant text of Code of Civil Procedure, section 2077, follows: "The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful and there are no other sufficient circumstances to determine it: . . . Five—When tidewater is the boundary, the rights of the grantor to ordinary high-water mark are included in the conveyance. When a navigable lake, where there is no tide, is the boundary, the rights of the grantor to low-water mark are included in the conveyance."

Thus, for more than a hundred years, Civil Code section 830 and Code of Civil Procedure section 2077 were deemed to have "irrevocably conveyed into *absolute* [our italics] private ownership" (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d p. 482), with "*unrestricted*" [our italics] title to the grantee" (*Alameda Conservation Assn.* v. *City of Alameda, supra,* 264 Cal.App.2d p. 287), and "the *fee simple title* [our italics] to said lands" (*Perry* v. *State of California, supra,* 139 Cal.App.2d pp. 380-381).

Federal courts were in agreement: "Since enactment of California Civil Code § 830, it has been the law in California that the state's title to lands under navigable streams extends only to the low-water mark." (*United States* v. *Gossett, supra,* 277 F.Supp. 11, 13.)

And when administrative agencies of the state inquired of its successive Attorneys General, they were advised that: "It is now settled law in California that *private ownership extends to low water mark* [our italics] of nontidal navigable waters" (43 Ops.Cal.Atty.Gen. 291, 295 (1964)); that "under Civil Code section 830 the owner of land bordering a navigable lake *owns to the edge of the lake at low-water mark*" (our italics, 30 Ops.Cal.Atty.Gen. 262, 269 (1957); and that "the littoral owner of land bordering on a navigable lake takes to the '*edge of the lake . . . at low-water mark*' " (our italics, 23 Ops.Cal.Atty.Gen. 306, 307).

But then, March 20, 1981, the rule of *Lyon, supra,* 29 Cal.3d 211, was announced.

 *Lyon* holds that although the owner of land alongside a navigable lake or stream owns *title* between its high-water mark and its low-water mark, that title is subject to a public trust requiring him to *restore and maintain the land in its "natural state."*

The rationale: "Lands of the type involved in this proceeding constitute a resource which is fast disappearing in California; they are of great importance for the ecology, and for the recreational needs of the residents of the state." (*Lyon, supra,* 29 Cal.3d p. 216.)

*Lyon* thus rejected, sub silentio, the court's earlier rule of *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482, that upon such a grant the land above the low water mark was "*irrevocably* conveyed into *absolute* private ownership" (our italics), and the holding of *Peabody* v. *City of Vallejo, supra,* 2 Cal.3d 351, 356, that the state and its Legislature were free to do so. So also, the court rejected the rules long ago announced by the United States Supreme Court: "If they [the states] choose to resign to the riparian proprietor, rights which properly belong to them in their sov-

ereign capacity, it is not for others to raise objections." (*Barney* v. *Keokuk, supra,* 94 U.S. 324, 338 [24 L.Ed. 224, 228]); and, referring to a grant of land by California upon one of its inland waterways, the high court said that the states may *not* constitutionally "impair the efficacy of the grants, or the use and enjoyment of the property, by the grantee." (*Packer* v. *Bird, supra,* 137 U.S. 661, 669.)

Lyon of *Lyon* was and is the Lyon of the case at bench.

Clear Lake in Lake County, California, is a navigable body of water about 64 square miles in area. The lake's surface rises and falls with the seasons. About 800 acres of land known as the Anderson Marsh, along Clear Lake's southern shore, had been patented and conveyed by California to the predecessors in interest of Lyon. About 500 acres of the land were marshland which was covered with water when the lake was at its highest; it was between the lake's natural low water and high water marks. The remainder lay landward of the lake's high water mark.

In 1971, Lyon was engaged in negotiations for the sale of the entire property, in contemplation of which he purchased policies of title insurance from Western. The policies, with some exclusions, generally insured in Lyon fee simple title to the entire 800 acres. For some reason the sale of the property was not consummated, but the title insurance policies nevertheless were paid for and remained in force.

Thereafter, seeking permission to repair a levee and thus reclaim a portion of the lower marshland, Lyon was advised by a state agency that the state claimed ownership of the portion of the property which extended below the lake's high water mark. An action was filed by Lyon seeking to quiet title to his property against the State of California's claim. The state responded with a cross-complaint to quiet title, among other things, to the portion of Anderson Marsh between high and low water. The County of Lake, apparently concerned with the diminution of its real estate tax base were the state to prevail, intervened in the action on behalf of Lyon. On the parties' respective motions for summary judgment the trial court ruled in favor of Lyon, and judgment was entered accordingly. The state sought relief by an application for a writ of mandate. The mandate proceedings reached the California Supreme Court, which by a four-to-two opinion (*Lyon, supra,* 29 Cal.3d 210) reversed, and directed entry of summary judgment for the state in the manner we shall hereafter point out.

The *Lyon* decision is now *final.*

*Lyon,* as noted, held that, although Lyon owned *"title"* to the 500-acre portion of Anderson Marsh which lay between the high water and low water marks of Clear Lake, such title was impressed with a public trust commanding, among other things, that the 500 acres of marshland be restored to, and maintained in, its *"natural state."*

It will be seen, and as noted, that under *Lyon,* the riparian owners, including Lyon, alongside California's navigable inland waterways were denied beneficial use of, or right to improve in any way, such of their land as fronted upon the waterway at high water. The ruling was of *first impression* in California and, insofar as we have been able to determine, elsewhere in the United States.

Contemporaneously with *Lyon,* the high court decided *State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240 [172 Cal.Rptr. 713, 625 P.2d 256], affecting the California shores of Lake Tahoe, in which it reached substantially the same result. *Lyon,* however, has been described as the leading case on the new doctrine.

As a result of *Lyon,* according to Lyon, the most valuable part of his property, fronting on Clear Lake, had been rendered valueless. It may not be improved, nor even used, in any beneficial or meaningful way. For it must now be preserved by him in its "natural state" as marshland. Yet, as noted, under such circumstances, a state may not *constitutionally* "impair the efficacy of the grants, or *the use and enjoyment of the property,* by the grantee." (Our italics, *Packer* v. *Bird, supra,* 137 U.S. 661, 669.)

For more than 100 years Californians have been acquiring land on the shores of inland waterways on the reasonable belief and expectation that they would own and enjoy, and might construct improvements upon, the land to the low water mark. There are no less than 4,000 miles of such land (see *Lyon, supra,* 29 Cal.3d p. 216) most, or much, of it converted from its "natural state" to residential and commercial property, and farmland. Those 4,000 miles must reasonably concern thousands, perhaps hundreds of thousands, of now devalued land titles acquired in reliance upon the rule of Civil Code section 830. The farms, homes and improvements thereon are now declared by *Lyon* to be unlawful, for they were fashioned contrary to a public trust that the land be maintained in its "natural state."

The reclamation and improvement of marsh and overflowed land, such as the Anderson Marsh property of Lyon, has been *expressly* encouraged and implemented by California's Legislature during the past century. Statutory provisions for reclamation of such land abound in our law, "because of the public benefit derived therefrom." (*Islais Creek Rec. Dist.* v. *All Persons*

(1927) 200 Cal. 277, 280 [252 P. 1043].) "The reclamation of the vast bodies of swamp and overflowed land in this state may justly be regarded as a public improvement of great magnitude, and of the utmost importance to the community." (*Laguna etc. Dist.* v. *Chas. Martin Co.* (1904) 144 Cal. 209, 213 [77 P. 933].) Indeed, much of such reclaimed land of the state lies in the so-called Delta area, at the freshwater confluence of the Sacramento and San Joaquin rivers, of which respected authority states: "The aggrading river and the inland-growing Delta were surrounded by malarial swamps. . . . There was nothing pleasant or healthful about these natural, historic conditions. They caused death, disease, and untold suffering. . . . The historical record is conclusive on all these points." ("An Assessment of Planning for Water-Pollution Control . . . [December 1975] A Report Submitted by: INTREC, INC. Under Contract NSF-C-1046 to the National Science Foundation Scientific, Technological, and International Affairs Directorate Science and Technology Policy Office; Reproduced by National Technical Information Service *U.S. Department of Commerce*," our italics.)

On the instant appeal Lyon insistently contends that *Lyon's* innovative public trust doctrine which did not exist when he acquired Anderson Marsh, is bad law, unsupported by authority, violative of the separation of powers doctrine explicated by the state and federal Constitutions, and has taken his property for public use contrary to the state's Constitution, article I, section 19.

Respectfully, we find ourselves in agreement.

We do not think reasonable, the comment of *Lyon*: "We emphasize that Lyon is not deprived of the use of the lands between low and high water, and that he may utilize them in any manner not incompatible with the public's interest in the property." (29 Cal.3d at p. 232.) To the contrary, we believe that Lyon, required to maintain his 500 acres of marshland in their "natural state," is deprived of any *beneficial* use of that land. Nor do we find the language of Civil Code section 830—that when the land "borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark"—to be "ambiguous" as declared by *Lyon.* And surely under the long and uniform interpretation of Civil Code section 830, it may not now reasonably be said, as does *Lyon,* that "it is to be presumed that [Lyon] bought with knowledge of the law on the subject." Instead, we opine, it may more reasonably be said that Lyon purchased the property in the reasonable belief that California could *not constitutionally* "impair the efficacy of the grants, or *the use and enjoyment of the property."* (Our italics, *Packer* v. *Bird, supra,* 137 U.S. 661, 669 [34 L.Ed. 819, 821].)

Apparently unconsidered by *Lyon* was the tax revenue loss occasioned by the holding that 4,000 miles of valuable waterfront property must remain unused and unimproved in its natural state, with consequent diminution of its fair market value. The ruling, if implemented, will have profound effect upon the real estate tax revenues of the state's counties.

Moreover, since *Lyon* teaches that any past or future grant of such lands by the state is conditioned upon its described public trust, we think it here reasonably bears *emphasis* that such grants by the state have been held to be of *"absolute private ownership"* and *"freed from the trust"* (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482), of *"the fee simple title"* (*Perry* v. *State of California, supra,* 139 Cal.App.2d 377, 380-381), and *"free of the trust"* (*Alameda Conservation Assn.* v. *City of Alameda, supra,* 264 Cal.App.2d 284, 287).

We find nothing supportive of *Lyon's* innovative holding in *Illinois Central Railroad Company* v. *Illinois* (1892) 146 U.S. 387 [36 L.Ed. 1018, 13 S.Ct. 110], described by *Lyon* (29 Cal.3d p. 227) as the "seminal case on the scope of the public trust doctrine."

*Illinois Central Railroad Company* v. *Illinois* concerned the interstate, navigable, freshwater, nontidal (see *Lyon,* 29 Cal.3d p. 227), Lake Michigan. The City of Chicago had fashioned a harbor about two square miles in area. The Illinois legislature, in 1869, by a much criticized "Lake Front Act" had granted the railroad company perpetually *submerged* land extending for a mile under the water of the harbor; it was to be filled in for railroad purposes. The War Department, and others, claimed that the harbor's use for navigation was interfered with, and a subsequent Legislature repealed the Lake Front Act. The railroad company claimed a vested right under the act's grant, and the State of Illinois sued to vindicate the act's repeal. The State of Illinois prevailed. The case did *not* concern land between the lake's, or harbor's, low water and high water marks, except perhaps peripherally; such an area was not in issue, nor was it even mentioned in the high court's opinion. As material here the opinion simply held that the grant of continuously submerged land under the waters of Lake Michigan interfered unlawfully with the public right of interstate navigation and commerce.

And we note that both *before,* and *after, Illinois Central Railroad Company* v. *Illinois,* the courts of Illinois clung to the rule that: "The riparian owner [has] the right to the *exclusive use* [our italics] of the banks [of an inland waterway] to the low water mark." (*Ensminger* v. *The People* ex rel. *Trover* (1868) 47 Ill. 384, 391; *City of Peoria* v. *Central Nat. Bank* (1906) 224 Ill. 43 [79 N.E. 296, 297].)

Nor do we find the several cases cited in, and relied upon by, *Lyon* (29 Cal.3d 210, 221-222, fn. 9) to support its holding. They simply point up instances where, *unlike California,* a minority of states had elected, as was their right (see *Hardin* v. *Jordan, supra,* 140 U.S. 371, 382 [35 L.Ed. 428, 433]; *Barney* v. *Keokuk, supra,* 94 U.S. 324, 328 [24 L.Ed. 224, 227]), to limit private ownership along the banks of their navigable inland waterways to the high water mark.

Finally, we observe it to be the law that under "the *separation of powers doctrine,* the fundamental doctrine which recognizes that in the absence of some overriding constitutional, statutory or charter proscription, *the judiciary has no authority to invalidate duly enacted legislation."* (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 915 [120 Cal.Rptr. 707, 534 P.2d 403], our italics.) " '[T]he courts should only exercise those common law powers which are not otherwise repugnant to or inconsistent with our Constitution and statutes; *inherent powers should never be exercised in such a manner as to nullify existing legislation or frustrate legitimate legislative policy.'* " (*People* v. *Municipal Court (Runyan)* (1978) 20 Cal.3d 523, 528 [143 Cal.Rptr. 609, 574 P.2d 425 2 A.L.R.4th 681], italics in original.) And: "[I]f the subject-matter of the legislation be of such a nature that there is any doubt of its character, or if by any possibility the legislation may be for the welfare of the public, *the will of the legislature must prevail over the doubts of the court."* (*In re Madera Irrigation District* (1891) 92 Cal. 96, 309-310 [28, P. 97], italics added.)

And, as recently as 1971, the state's high court, referring to the public trust of this case has held (the italics are ours): "It is a *political* question, within the wisdom and power of the Legislature, acting within the scope of its duties as trustee, to determine whether public trust uses should be modified or extinguished." (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 260-261 [98 Cal.Rptr. 790, 491 P.2d 374].)

Article X, section 4 of the state's Constitution says that "the *Legislature* [our italics] shall enact such laws . . . so that access to the navigable waters of this state shall be always attainable for the people thereof." And Article XA of the same Constitution calls upon the *Legislature* to implement its "Water Resources Development" provisions. It has been expressly held by earlier decisions of our high court that: "The administration of the trust [for commerce and navigation] is committed to the *Legislature."* (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 482, fn. 17, our italics) And where: "the *Legislature* has 'found and determined' that . . . submerged lands [are] no longer required for navigation, commerce, and fisheries . . . [t]hat determination and finding is conclusive upon this court in the absence of evidence indicating that the abandonment of the public trust will impair

the power of succeeding *legislatures* to protect, improve, and develop the public interest in commerce, navigation, and fisheries." (*Mallon* v. *City of Long Beach* (1955) 44 Cal.2d 199, 206-207 [282 P.2d 481], italics added.)

Further, it should be needless to *iterate* that, in California, private property may not constitutionally be taken for public use without payment of just compensation to its owner.

We are not alone in our criticism of *Lyon*: See Note, *Lyon and Fogerty, Unprecedented Extensions of the Public Trust* (1982) 70 Cal.L.Rev. 1138; *The Public Trust after Lyon and Fogerty, Private Interests and Public Expectations—A New Balance* (1983) 16 U.C. Davis L. Rev. 631; Note, *Property Boundaries—Civil Code Section 830 Grants Nontidal Shorezone to Private Landowners, Subject to Tidelands Trust* (1982) 22 Santa Clara L.Rev. 559.

■ Nevertheless, we are told by *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], that "all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction." ■ Obedient to that rule, and regardless of the views we have expressed, we must, and do, declare the holding of *Lyon* to be the law of this state.

We pass on to the second of Lyon's contentions, that Western had insured title to his land against such a public trust as was declared by *Lyon*.

■ Seeking somehow to recoup the loss brought about by *Lyon*, the instant action was brought by Lyon against Western, on the theory that Western had insured an *unconditional* fee simple title to Anderson Marsh. But Western, as noted, demurred to the complaint, pointing out that its title insurance policies, among other things, *excluded*: "Any claim or title of the State of California and/or the United States of America as to all or any portion of said land lying *within the bed of Clear Lake . . . under natural conditions.*" And, as we have earlier pointed out, the demurrer was sustained, judgment of dismissal of Lyon's action was entered, and this appeal was taken.

We have concluded that this provision excluded from coverage by Western's policies the claim made by the State of California, and found valid by *Lyon*.

The term "bed of Clear Lake under natural conditions" *plainly and understandably,* we think, refers to the lake bottom under the high water mark. And it appears to have been uniformly so held.

■ "The bed of a river is 'that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water. . . .' " (*U.S.* v. *Chicago, M., St. P. & P. R. Co.* (1941) 312 U.S. 592, 596 [85 L.Ed. 1064, 1070, 61 S.Ct. 772].) "[T]he bed of a nonnavigable river must be deemed to be bounded by the permanent banks which confine the waters in their course at their highest level. The banks of a river are the boundaries which confine the water to its channel throughout the entire width when the stream is carrying its maximum quantity of water." (*Mammoth Gold Dredging Co.* v. *Forbes* (1940) 39 Cal.App.2d 739, 751 [104 P.2d 131].)

The definitions reasonably, and by authority, apply also to *lake beds. Bed* "includes the lands below ordinary high water mark. . . . Bed of navigable lake extends to high water mark." (Black's Law Dict. (4th ed. 1968) p. 196.) "[T]he bed of a navigable lake extends to the high-water mark." (*Miami Corporation* v. *State* (1936) 186 La 784 [173 So. 315, 325].) "[H]igh-water mark . . . is the outer line or limit of the lake bed." (*State* ex rel. *Casson* v. *Thomas* (1916) 173 Iowa 408 [155 N.W. 859, 861].)

■ Another contention of Lyon, as we understand it, is that *Lyon* gave effect to the public trust upon his upland which was in no way affected by it, and was therefore not within the exclusion of Western's policies. But a fair reading of *Lyon* reveals that its holding relates *only* to the portion of Lyon's 800 acres lying within the *bed* of Clear Lake. And, of course, Western's exclusionary clause does not relate to land which is *not* within the *bed* of Clear Lake, and concerning which the state makes no claim.

And the argument is further made by Lyon, as alleged in the complaint, that "the exclusions contained within the *title insurance policies* were not *clearly* legible." (Our italics.) But we note that at the hearing on Western's demurrer, Lyon conceded that the reference was to Western's "preliminary title report" which did not purport to be a title *insurance* policy, and upon which Lyon bases no claim. And we observe the absence of any allegation that Lyon could *not* read or understand the "not clearly legible" preliminary title report. As has been pointed out, following the sustaining of a demurrer to the complaint, Lyon declined to amend. ■ "[W]hen a plaintiff is given the opportunity to amend his complaint and elects not to do so, strict construction of the complaint is required and it must be presumed that the plaintiff has stated as strong a case as he can." (*Gonzales* v. *State of California* (1977) 68 Cal.App.3d 621, 635 [137 Cal.Rptr. 681].) We find no merit in the claim.

For the reasons we have stated it is concluded that the judgment of the superior court, in the action now before us, must be affirmed.

The judgment is affirmed.

Holmdahl, J., concurred.

**RACANELLI, P. J.,** Concurring and Dissenting. I agree with the result reached in light of the controlling holding in *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239], under the doctrine of stare decisis. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) But I cannot endorse the lengthy dicta, sought to be justified in the guise of publishable criticism of an existing [Supreme Court] rule, which merely amounts in substance to no more than a reargument of the minority opinion. (See *State of California* v. *Superior Court (Lyon), supra,* 29 Cal.3d at pp. 233-239 (conc. and dis. opn. of Clark, J.).)

I believe that whatever heuristic value lies in the contrary position can be adequately resurrected by a footnote reference to the *Lyon* dissent appended to the dispositive portion (three to four pages at most) of the lead opinion.

A petition for a rehearing was denied April 17, 1986. Racanelli, P. J., was of the opinion that the petition should be granted. Appellants' petition for review by the Supreme Court was denied June 25, 1986.